Gerald **WOOD**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 47835.

Court of Criminal Appeals of Texas.

June 26, 1974.

Rehearing Denied July 17, 1974.

W. V. Dunnam, Jr. (on appeal only) Waco, for appellant.

Martin Eichelberger, Dist. Atty., Ward Casey, Asst. Dist. Atty., Waco, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for murder with malice wherein the jury assessed the punishment at fifteen (15) years' confinement in the Texas Department of Corrections.

Sue Benton was the only incriminating witness offered by the State. Dr. Ronald Henderson testified to the cause of death as being multiple gunshot wounds, and Douglas Parker made a call to the scene where he found the body of the deceased. Harold Denton testified about a property release card from the Waco Police Department.

Sue Benton testified that on the date in question she had been drinking that evening with the deceased, Thomas Heffington, and her sister, Nelda Conner, also known as "Jackie." It appears from the evidence that prior to the occasion in question "Jackie" had been having an affair

with the appellant, but at the time of the alleged offense she had been bestowing her affections on the deceased. After the drinking session mentioned continued at several lounges, Sue Benton left her sister and the deceased and went to the Westview Lounge, managed by the appellant, and later asked him to drive her home. Appellant indicated he wanted to know where Jackie and the deceased were, and the two drove around looking for them. After the second stop at the house of Sue Benton's parents, she affirmed he said, "If the sonabitch (sic) is there, I am going to kill him." He disappeared into the house and she heard several shots. When he emerged, she heard the appellant say, "I killed him, I shot him." When she stated the police should be called, the appellant told her to get out of the car, as he was leaving because he was not going to spend the night in jail. She entered the house and found the deceased on a bed. He had no pulse.

Appellant advances eighteen grounds of error.

First, we shall consider appellant's contention that the trial court erred in admitting, over objection, "the written statement of Sue Benton made to an officer outside of Court without the presence of the defendant."

On direct examination Sue Benton testified she could not remember what the appellant said before he left the car and went into the house just prior to the shooting. The prosecutor then handed her a written sworn statement she had made to a police officer shortly after the shooting to refresh her memory, but she testified she didn't remember the appellant saying, "If the son of a bitch is there, I am going to kill him." The court sustained the objection the State was attempting to impeach its own witness, and the prosecutor moved on to other matters.

Later, on cross-examination defense counsel inquired:

"Q Is there anything about the statement Mr. Casey has in his file, that he showed you a while ago, which is incorrect?

"A That thing, the police statement, I can't remember now Gerald saying he was going to kill him. If he did, I don't remember it now.

"Q In other words, he might not have said that?

"A He might not have; I don't remember it."

Thereafter, on redirect examination the prosecutor inquired if the witness "wouldn't remember a little ole insignificant detail like that . . . ." Upon objection that the State was attempting to impeach its own witness, the prosecutor stated, "Your Honor, she gave a prior inconsistence (sic) statement under oath." Appellant's objection was overruled. A hearing was then held in the absence of the jury. The prosecutor was sworn and claimed surprise that the witness Benton had not testified in accordance with the statement given to police regarding a threat made by appellant just prior to going into the house where the homicide occurred. He urged that she was a "hostile" witness and testified ". . . we are fixing to file on her for either false swearing, or purgery (sic)."

The prosecutor then asked to impeach his own witness. When the court asked the witness if she had anything to say, she replied:

"A Yes, sir. This has been almost seven months since this incident has happened. If I said that, and I swore to it, I meant it. And this—like I said, I can't remember word for word what was said. If it's on that paper, or any of it, that I said it, it's true. And I don't see how you can sit there and want to impeach me for something that happened along (sic) time ago, because I can't remember it word for word.

"MR. CASEY (Prosecutor): That isn't what came down to the Jury. You said, I didn't say that, and they kept making mistakes and everything.

"A  I said, that I didn't remember. I didn't say I didn't say it. I said, I didn't remember. If it's on that paper, I said it, because I am not a liar."

The court withheld its ruling.

The next day, again in the absence of the jury, the prosecutor urged he be given the opportunity to impeach the witness. Appellant's counsel pointed out that the witness had simply failed to remember what was in her statement, had now confirmed her statement, and was not a "hostile" witness to the State. He urged that under these circumstances the witness was not subject to impeachment.

Nevertheless, the court stated: "I am going to grant the motion to impeach the witness."

Thereafter, in the presence of the jury the prosecutor established that the statement had been given under oath and inquired if the statement contained the following:

".  .  .  'I watched him walk up to the house, and he told me if the son of a bitch is there, I am going to kill him. I was sitting there waiting and I heard three shots. I waited, and Gerald Wood came running out back to the car and said, "I killed him, I shot him."' Is that true, or is that false?

"A  I remember the last part of it. Now, like I told you yesterday, this has been nearly 7 months ago. And if he said the first phrase—if I said it that night, it was fresh on my mind, and he said it, because I swore to it. And as you can see, I signed it. But I am just human like anybody else. I forgot.

"Q  All right. Is it true, or is it false?

"A  I suppose it's true, if I signed it, because I am not going to lie about it."

The State then offered the entire statement into evidence over the objection that "it's not factually given. It's at least inconsistent with the testimony that was received in the trial, and I suggest that it is not worthy to be admitted into evidence." The objection was overruled.

■ Much confusion seems to exist among the bench and bar about when a party may impeach its own witness. It is nevertheless well established that a party introducing a witness cannot attack his or her testimony *unless the witness has stated facts injurious to such party*. Article 38.-28, Vernon's Ann.C.C.P.; Mims v. State, 159 Tex.Cr.R. 180, 261 S.W.2d 727 (1953); Wall v. State, 417 S.W.2d 59, 61 (Tex.Cr. App.1967); Norwood v. State, 486 S.W.2d 776 (Tex.Cr.App.1972); Zanders v. State, 480 S.W.2d 708 (Tex.Cr.App.1972). It is not sufficient to justify impeachment that the witness merely fails to testify as expected or to remember facts favorable to the party calling the witness. Crandall v. State, 170 Tex.Cr.R. 229, 340 S.W.2d 36 (1960); Wall v. State, supra.

"In other words, notwithstanding that the party is surprised thereby, it is not enough that the witness simply disappoints the expectations of the party, by failing to give testimony as beneficial as was expected." 62 Tex.Jur.2d, Witnesses, Sec. 326, p. 345.

■ In the instant case the witness did not testify that the statement was not made by appellant, only that she could not now remember if he had made such statement. Under such circumstances, she had not stated facts injurious to the State, and she was not the proper subject for impeachment by the State, who had called

her as a witness.[1] The statement should not have been admitted under the guise of impeachment. See and compare Rice v. State, 135 Tex.Cr.R. 390, 120 S.W.2d 588 (1938).

We must, nevertheless, determine if the statement was admissible under some other theory.

In McCormick and Ray, Texas Law of Evidence, 2d ed., Sec. 541, p. 438, it is written:

"There are two stages of recollection as far as the law of evidence is concerned. It is important at the outset to point out the distinction between them. In the first place there is the recollection which the witness ordinarily exhibits on the stand. This is known as Present Recollection. Then there is that recollection which the witness once possessed, but which has now vanished and is available only if preserved by some memorandum. This will be referred to as Past Recollection.

"In Present Recollection the witness has some recollection of the event or matter in question and after being permitted to look at the paper or memorandum he then speaks from memory. The important thing and that which goes in evidence is the revived recollection of the witness. Since the witness speaks from memory and not from the paper the manner in which the recollection is refreshed should not make a great deal of difference.

"In Past Recollection the witness usually has no present recollection whatever, but desires to use that recollection which he once had by offering a record of that past recollection. He says, 'I have no recollection now, but when my memory was still fresh I made a correct memorandum. I can offer this memorandum which contains my past recollection.' The important thing here is the memorandum. It goes in evidence. So the accuracy and identity of the record must be assured. Thus it will be seen that a memorandum may be used in two ways, i. e., to refresh a present recollection or as evidence of a past recollection.

"This distinction has not always been observed by the courts and there is today much confusion about it. This is due, in part, no doubt, to the loose use of the term 'refreshing the memory' to cover both types of recollection. Many courts will be found still misapplying this phrase. The failure to keep the two distinct principles clearly in mind has caused courts to fall into the error of applying the rules and tests governing one to a case involving the other."

■■■ Where the memorandum, statement or writing is used to refresh the present recollection of the witness and it does, then the memorandum does not become part of the evidence, for it is not the paper that is evidence, but the recollection of the witness. Green v. State, 53 Tex. Cr.R. 490, 110 S.W. 920 (1908); McCormick and Ray, Texas Law of Evidence, 2d ed., Sec. 541, p. 438. The party utilizing such statement, etc., to refresh the present recollection of its own witness should not offer it into evidence, although the opposing party may do so for the purpose of seeing if it could properly refresh the witness' memory.

1. If the witness had denied the appellant ever made such threat or that she had never said so, etc., then the State would have been entitled to lay a predicate of surprise and to introduce the witness" prior statement for the purpose of impeachment. Under such circumstances the court should give a jury instructions limiting such evidence to the question of the witness' credibility. Where a witness admits making the prior statement and that it is inconsistent with trial testimony, the prior inconsistent statement is not admissible, for under such circumstances the witness has performed the act of impeachment upon himself or herself. See Kepley v. State, 167 Tex.Cr. R. 233, 320 S.W.2d 143, 145 (1959); Sloan v. State, 129 Tex.Cr.R. 131, 84 S.W.2d 484 (1935). See also Cherb v. State, 472 S.W.2d 273, 278 (Tex.Cr.App.1971), and cases there cited.

In the instant case present recollection was not involved, for although the original statement was exhibited to the witness on several occasions, she consistently contended she had no present recollection of the appellant having made the threat in question just prior to the alleged offense. She did testify that, while the written sworn statement made to the police did not refresh her present recollection as to appellant's threat made before he entered the house where the killing occurred, she did give the statement on the "night" of the alleged offense, that she signed and swore to it and that if the statement reflected appellant made such threat it was true. It thus appears that rules of the use of a memorandum of past recollection were met. It was shown that the memorandum was made at or near the time of the event in question and that the witness guaranteed the correctness of the memorandum. McCormick and Ray, Texas Law of Evidence, 2d ed., Secs. 543 and 544, pp. 440–442. Unlike the rules relating to present recollection where past recollection is involved and the witness identifies the memorandum and guarantees its correctness, the writing as well as his testimony are admissible in evidence. McCormick and Ray, Texas Law of· Evidence, 2d ed., Sec. 547, p. 443. [2]

Thus, it appears that the written statement of the witness was admissible as the use of a memorandum of past recollection, although the trial court admitted it under an erroneous theory. [3]

If it can be argued that only that portion of the statement relating to the alleged threat should have been introduced and not the entire statement, it is observed that the objection to the statement's admission was not addressed to this proposition. If the statement was admissible for any purpose, counsel should have addressed his objection to any portion which was inadmissible.

Appellant further complains that the court failed to give a jury instruction limiting the use of such statement to the issue of the witness' credibility. From what has been written, such instruction would not have been proper. Further, we find no written objection nor special requested charge relating to the matter. See Articles 36.14 and 36.15, Vernon's Ann.C.C.P. No error is presented.

During the redirect examination of Sue Benton, it was established, without objection, that since the alleged offense the appellant had been "dating" Jackie Connor. The record then reflects the following:

"Q And Gerald Wood is going with your sister, and your sister is wearing pretty nice clothes on her back for a lady that don't work.

"MR. KHOURY (Defense Counsel): If it please the Court: I am going to object because he is leading his witness.

"THE COURT: I will overrule the objection.

"Q Isn't that true ma'am?

"A My sister has worked.

"Q Is she working now?

2. Walker v. State, 473 S.W.2d 497 (Tex.Cr. App.1971), is a good case to illustrate the use of a memorandum to refresh the past recollection of the witness, though the court's opinion does not discuss such rule. In that case Baker, brother-in-law of Walker, proved to be a recalcitrant witness for the State, admitting to having had a telephonic communication with someone about the murder arising out of the robbery charge being prosecuted. The prosecutor showed Baker his grand jury testimony in an attempt to refresh his memory. He testified the grand jury testimony was true, but he could not repeat the same, pleading "poor memory." The grand jury testimony was admitted.

3. The instant case does not involve the introduction of a memorandum under the Business Records Act, Article 3737e, Vernon's Ann. Civ.St., nor does it involve a witness suffering from total amnesia as discussed in the dissent.

"A    She's layed off right now."

The appellant complains that the first question asked above in the quoted portion of the record "was prejudicial and reversible error," citing Chatterfield v. State, 436 S.W.2d 146 (Tex.Cr.App.1969).

Appellant contends that the jury knew he was a married man and that the question informed the jury he was "up to the time of trial persisting in going with a woman other than his wife and buying her clothes for her."

First, we observe that the fact appellant was presently "dating" Jackie Connor was already in evidence without objection. Second, the objection proffered was only that it was a leading question. Lastly, we observe that the question was not fully answered, as the witness related only that her sister had worked, and her answer did not establish who bought her sister's clothes.

In Chatterfield, an assault to rob prosecution, the question asked concerning Chatterfield's telephone call to a married woman was wholly unrelated to any issue relevant to the trial and disassociated with the offense. In the instant case the relationship of the appellant with Jackie Connor was integrally related to the alleged killing and the question of motive. Under the circumstances, the contention is without merit.

After the above complained of question was asked, appellant's counsel on cross-examination established that appellant was not employed, that he was not supporting the witness' sister, who was living with her mother and father, etc. The concluding question was:

"Q    It would seem pretty apparent, Mrs. Benton, that the fact the Court had to appoint an attorney to represent him, he didn't have very much in the way of funds to be supporting anybody, let alone your sister?

"A    It looks like it."

Immediately on redirect examination the prosecutor asked:

"Q    Of course, he was also capable, ma'am, of making a $15,000.00 bond, and hasn't spent one day in jail since this happened.

"MR. KHOURY: If it please the Court: I am going to object to that. Unless the witness can testify as to exactly what the terms of the financial transactions were concerning the making of any bond.

"THE COURT: I will overrule the objection.

"MR. KHOURY: Note our exception.

"Q    Somehow or another, he was still able to sign a pauper's oath although he was able to make a $15,000.00 bond.

"A    I don't know anything about that.

"MR. CASEY: Pass the witness."

On recross-examination appellant's counsel sought to establish that appellant's former employer had arranged bail for him, but the witness professed no knowledge concerning the matter.

By numerous grounds of error appellant attacks the above sequence of questions by the prosecutor, contending that his exercise of a constitutional right (right to bail) may not be used to prejudice him with the jury, and that the question inferred that he had falsely sworn to a pauper's oath.

We observe that appellant first opened up the question of appellant's present financial status and sought to show that he was presently unemployed. Further, the objection at trial did not call the trial court's attention to the alleged error complained of on appeal and presents nothing for review. See Pitts v. State, 478 S.W.2d 555 (Tex.Cr.App.1972). Still further, the witness lacked knowledge and was unable to answer the questions. Ordinarily, the mere asking of a question which is not answered does not constitute reversible error. Lopez v. State, 482 S.W.2d 179

(Tex.Cr.App.1972). The question propounded must be obviously harmful to the defendant before a conviction will be reversed. Sensabaugh v. State, 426 S.W.2d 224 (Tex.Cr.App.1968). In deciding such question it must be remembered that each case has its own characteristics, and the reviewing court will look at the entire record with the surrounding circumstances and their possible relationship to other testimony in order to determine the probability or possibility of injury.

■ Further, appellant's counsel had repeatedly injected into the case the fact that he was appointed, and it is common knowledge that attorneys are appointed to represent indigent defendants in criminal cases.

While the questions should not have been asked, we cannot conclude that reversible error is reflected under all the circumstances described above.

Appellant complains that in argument, during the penalty stage of the trial, the prosecutor argued:

"He would rather sit back and let the tax payers pay for his lawyer than to go out and earn the money and have a lawyer. He's free on a $15,000.00 bond."

■ While such argument should not have been made, see Doby v. State, 455 S.W.2d 278 (Tex.Cr.App.1970), we observe that no objection at all was made. Nothing is presented for review. Palmer v. State, 475 S.W.2d 797 (Tex.Cr.App.1972); Lopez v. State, 468 S.W.2d 365 (Tex.Cr.App.1971).

Appellant further complains of other actions of the prosecutor on redirect examination of the witness Benton. After appellant's counsel had sought to elicit from the witness that appellant's employer had arranged bail, the prosecutor on redirect asked:

"Q Of course, Gerald Wood or Mr. Curtis (Wood's employer) one could tell the Jury about that, couldn't they?

"A Well, it wasn't any of my business—

"Q Well, Gerald Wood would know alot more about that—

"MR. KHOURY: I am going to object to counsel making any statement at all concerning the defendant's ability or requirement to testify in this lawsuit. I believe the law will take care of that.

"THE COURT: Overruled.

"MR. KHOURY: Note our exception.

"Q And Gerald Wood could tell us whether he is working or not far better than you, couldn't he?

"A He could do what now?

"Q He could tell us whether or not he is working at this time far better than you could.

"A I suppose so. But I don't know of him working.

"MR. CASEY: Pass the witness."

Appellant contends the prosecutor thus alluded to his failure to testify at the guilt-innocence stage of the trial in violation of Article 38.08, Vernon's Ann.C.C.P., and the Fifth and Fourteenth Amendments of the United States Constitution.[4]

■ We have recently held again that, for a comment on a defendant's failure to testify to be reversible error, the language must be looked at from the jury's standpoint and the implication that the language used had reference to an accused's failure to testify must be a necessary one. Winkle v. State, 506 S.W.2d 891 (Tex.Cr.App. 1974). And in Yates v. State, 488 S.W.2d

4. The appellant did not testify at the guilt-innocence stage of the trial, but did testify at the penalty stage thereof.

463, 466 (Tex.Cr.App.1972), we observed that "[i]t is not sufficient that the language might be construed as an implied or indirect allusion thereto [the failure to testify]." See also Lipscomb v. State, 467 S. W.2d 417 (Tex.Cr.App.1971); Ramos v. State, 419 S.W.2d 359 (Tex.Cr.App.1967).

▮ Any inference that the prosecutor was commenting on the appellant's failure to testify by his question was not so direct or necessary as to offend the rules discussed in Winkle v. State, supra. No reversible error is presented.

Appellant's remaining grounds of error concern the questioning of witnesses during the penalty stage of the bifurcated trial.

▮ Elmer Curtis, appellant's employer, was a reputation witness for him. On cross-examination the prosecutor attempted to show that suspension of the liquor license of Curtis' lounge where appellant was employed was due to a shooting which the Liquor Board thought appellant could have helped prevent. The witness answered, "I don't know."

Appellant complains of such interrogation, but we observe that no objection was made, presenting nothing for review. Nichols v. State, 504 S.W.2d 439 (Tex.Cr. App.1974).

Leftwich, another reputation witness, testified appellant's general reputation for being a peaceful and law-abiding citizen was good. Initially, the witness had voluntarily responded that he had never known appellant to be "disorderly." On cross-examination Leftwich was asked if he considered it "disorderly" for the appellant "to be consorting with a woman other than his wife." The objection was the lack of materiality, which was overruled. The record then reflects:

"Q Did you consider that slightly disorderly conduct, sir?

"A Inspite of the times, yes."

Appellant *again complains of a deliberate attempt by the prosecutor to prejudice him in the eyes of the jury.*

▮ The approved method of cross-examining reputation witnesses is by means of "have you heard" questions.[5] However, since the witness had injected the word "disorderly" into a non-responsive answer, and since the fact that appellant had been consorting with a woman other than his wife was in evidence at numerous places in the record without objection, we cannot conclude reversible error is reflected. The general rule is that a judgment will not be reversed for error in admission of improper evidence if the same facts were proved by other testimony to which there were no objections. Yates v. State, 488 S.W.2d 463 (Tex.Cr.App.1972); Baity v. State, 455 S.W.2d 305 (Tex.Cr. App.1970).

Appellant next complains of the prosecutor's cross-examination of him when he testified at the penalty stage of the trial. On direct examination appellant related that in his employment at the lounge owned by Curtis he had had occasion to evict people from the place of business.

On cross-examination appellant was asked if he used black-jacks or billy-clubs in evicting people and he denied this. He was then asked:

"Q You didn't go up beside the head of a fellow named Stan Gregory with a black-jack?"

▮ The vigorous objection that this interrogation was not proper under Article 37.07, Vernon's Ann.C.C.P., as it related to the hearing on punishment was overruled.

In subsequent questioning the question complained of was never answered. The appellant denied knowing a Stan Gregory.

5. See Crawford v. State, 480 S.W.2d 724 (Tex.Cr.App.1972); Brown v. State, 477 S.W.2d 617 (Tex.Cr.App.1972); Frison v. State, 473 S.W.2d 479 (Tex.Cr.App.1971).

There was no further pursuit of the matter by the prosecutor. We find no reversible error. See Sensabaugh v. State, supra; Fuller v. State, 501 S.W.2d 112 (Tex.Cr. App.1973).

During the cross-examination of appellant's daughter, the prosecutor asked:

"Q  Would that be reasonable to assume, that those little small children probably still love their daddy (the deceased), even though some folks say he was sorry?

"A  I didn't say my father (appellant) was sorry. I'm sure they did love their daddy.

"Q  Well, I'm saying your daddy is sorry.

"A  Well, I don't agree with you."

There was no objection, and nothing is presented for review. Nichols v. State, supra.

■ Lastly, appellant asserts that cumulative effects of the alleged errors deprived him of the fundamental fairness essential to due process of law.

The record reflects that this was a hard fought, at times acrimonious and even bitter, trial, with attorneys for both parties often pursuing immaterial matters and "running down rabbit trails." Under other circumstances some of the comments and conduct of the prosecutor might well have called for reversal, but our individual consideration of the grounds of error does not show reversible error, and, in light of the entire record, we do not conclude that collectively the grounds of error reflect reversible error.

The judgment is affirmed.

ROBERTS, J., concurs in the result.

ODOM, Judge (concurring).

I concur in the opinion of the majority, but wish to make a few comments regard-ing possible misinterpretations of our holding which should be avoided.

At first glance it may appear to some that today's holding regarding the admissibility of past recollections will permit the introduction of any and all memoranda which (1) are made at or near the time of the event in question and (2) are guaranteed to be correct by the witness. Such an interpretation could invite a deluge of documents such as all police reports, statements of witnesses, and matters possessing no additional "indicia of reliability" beyond the traditional two part test above stated. Regardless of admissibility in civil suits, the availability of the past recollection exception to the Hearsay Rule in criminal cases is not to be determined solely upon a mechanistic application of the traditional two part test.

Regarding Article 3737e, V.A.C.S., The Business Records Act, in Coulter v. State, Tex.Cr.App., 494 S.W.2d 876, at 882, 883, this Court stated:

"There is no doubt that the Business Records Exception to the Hearsay Rule is applicable in criminal cases. . . .

\*      \*      \*      \*      \*      \*

"However, in some circumstances, evidence within the ambit of a recognized exception to the Hearsay Rule is not admissible if it does not have the indicia of reliability sufficient to insure the integrity of the fact finding process commensurate with the constitutional right of confrontation and cross-examination. . .

\*      \*      \*      \*      \*      \*

"*Even if it* [the objected to exhibit] *was shown to be a business record entry, the indicia of reliability necessary for its admission is not shown.*" (Emphasis added).

Thus, even though the formal statutory requirements were satisfied, and admissibility *within the terms of the statute* was shown, this Court held the evidence was *not* admissible in the criminal proceeding. *Coulter* therefore clearly pointed out that, al-

though the Business Records Act exception to the hearsay rule is applicable in criminal cases, its application in such cases is conditioned upon the additional, non-statutory requirement that "indicia of reliability" beyond those of the statute be shown.

The same rationale dictates that the Past Recollection Recorded exception to the hearsay rule applicable in civil suits be available in criminal prosecutions not in a mechanistic manner but with the same tempering condition stated in *Coulter*,[1] supra. In this regard, it should be noted that the reasoning expressed in *Coulter* in its quotation at length from United States v. Ware, 247 F.2d 698 (7th Cir. 1957), upon proper facts would apply with equal force to the past recollection exception:

> "[E]ven if memoranda such as the ones in question are regularly prepared by law enforcement officers, they lack the necessary earmarks of reliability and trustworthiness."

Although Coulter v. State, supra, first expressed the standard for the "indicia of reliability" needed beyond that required by the statutory elements as "the indicia of reliability sufficient to insure the integrity of the fact finding process *commensurate with the constitutional right of confrontation and cross-examination*," such constitutional considerations are not really at the heart of the matter there decided. As stated both in *Coulter* and in *Ware,* supra, therein quoted, the fact that the entrants or makers of the memoranda are available for cross-examination and testify does not render tendered exhibits lacking the *extra*-statutory indicia of trustworthiness admissible. Nor does it even render them harmless when merely cumulative of other evidence, as was stated in United States v. Brown, 451 F.2d 1231 (5th Cir. 1971) quoted with approval in *Coulter,* supra. Although the right of confrontation is a relavant consideration in exceptions to the hearsay rule in criminal cases (as I will

discuss below), it is clearly a different consideration than that of the additional indicia of reliability required by authority of *Coulter,* since absence of the latter will require exclusion of the evidence even where the witness is present and testifying.

As far as the instant case is concerned, the majority opinion has demonstrated, without expressly applying it, compliance with the requirement of "indicia of reliability" beyond the mere algorithmic application of the traditional two part test for past recollections recorded. I refrain from attempting to express general rules for determining "indicia of reliability" because, as stated in Coulter, *supra,* 494 S.W.2d at 884:

> "More precise guide lines and rules cannot be laid down because the trustworthiness and reliability of records [or past recollections] in relation to the complexities of the fact situations in future cases cannot be anticipated."

Turning now to the issue of the right to confrontation and its bearing upon the use of past recollections recorded, I wish to say only that in the instant case there was no denial of that right. Full cross-examination was accorded respecting the question of whether the witness with the lapse of memory heard appellant make the threat. The lapse of memory went to the single detail, albeit an important one, and I am of the opinion that the cross-examination available was sufficient. The constitutional issue which would be presented if the witness at time of trial had total amnesia, however, would be a different one. The facts of this case, however, do not require further discussion. California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L. Ed.2d 489, did not reach the issue:

> "Whether Porter's apparent lapse of memory so affected Green's right to cross-examine as to make a critical difference in the application of the Con-

---

1. I note that Coulter v. State, supra, explicitly reserved decision on the availability of the

Past Recollection Recorded exception in criminal cases in footnote 3 of that opinion.

frontation Clause in this case is an issue which is not ripe for decision at this juncture."

Neither is the impact of an amnesiac witness upon a defendant's right to confrontation an issue for this Court to reach in this case.

With these caveats, I concur in the opinion of the majority.

MORRISON, J., joins in this opinion.