John Craner JACKSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 48900.

Court of Criminal Appeals of Texas.

Nov. 20, 1974.

Rehearing Denied Dec. 18, 1974.

James P. Finstrom and Kerry P. Fitz-gerald, Dallas (both Court-appointed), for appellant.

Henry Wade, Dist. Atty., W. T. Westmoreland, Jr., Asst. Dist. Atty., Dallas, and Jim D. Vollers, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal arises out of a conviction for the offense of murder with malice. After returning a verdict of guilty, the jury assessed appellant's punishment at confinement in the Texas Department of Corrections for life.

Some of the more salient facts must be detailed before considering appellant's grounds of error in view of the extremely complex nature of the case. Jan Hein and

Patsy Shelton, two employees of Memorex Corporation, opened said corporation's office in Farmers Branch in Dallas County about 8:30 a. m. on August 23, 1971. Upon entering the office, they discovered what were later shown to be bloodstains on the walls, carpet and furniture. At approximately 9:45 a. m. Police Officer Martin Brown of Farmers Branch began an investigation which culminated about 7:30 p. m. that same day with the discovery of the body of Billie C. Barnes. Barnes' body was discovered locked in the truck of his car which had been left in the parking area at Love Field Airport. Investigators from the Dallas County Sheriff's Office later located a fingerprint inside the door handle positioned immediately to the left of the driver's seat. This fingerprint was identified by James Cron, a fingerprint expert employed at the Dallas County Sheriff's Office, as being made by appellant's left thumb. Appellant was arrested some seven months later in California and returned to Dallas for trial.

At trial the witness Robert Overton, a Memorex employee then in the process of moving to California to begin new employment, testified that he was present at the Memorex office with appellant (then known to him as Larry Patterson) on the night of August 22, 1971. While they were both present, the deceased (Barnes) arrived and entered Overton's office. After a brief discussion, Overton left his office and walked some thirty-five or forty feet down a hallway when he heard a dull, metallic sound and then heard the deceased say, "Bob, you can't do that to me." Overton returned to his office and saw Barnes lying on the floor bleeding profusely from his head. After helping appellant load the body into Barnes' automobile, Overton assisted appellant in an effort to clean up the bloodstains. During this time appellant remarked that, "He (Barnes) must be Sicilian. He had a hard head." Overton then accompanied appellant to the airport where, after they had abandoned the deceased's automobile, he boarded a flight to San Francisco. Appellant remained in Dallas until the following day.

Through the testimony of Overton and of another witness, Mark Enright, the State proved that appellant was hired to kill Barnes by a Eugene Oliver. Oliver was the president of Memorex Corporation, which was then engaged in attempting to market a computerized device designed to improve a person's golf game. This product was to be promoted by a prominent professional golfer who had allowed his name to be used to promote the enterprise. For a number of reasons not here important, Memorex was in dire financial straits. During this time Barnes had threatened to persuade the professional golfer to remove his name from the sales promotion. Barnes, a former stockholder and executive of Memorex, was still covered by a Memorex "key man" life insurance policy in the amount of $200,000. In addition, there was considerable personal animosity between Oliver and Barnes which had resulted in threats by Barnes against Oliver, his family and his home.

This situation provoked Oliver, who also was indicted for this murder but tried separately, to inquire of Enright if he knew someone who would kill Barnes for him. Subsequently, Enright introduced appellant to Oliver. Enright testified that he did not believe Oliver was capable of committing such a crime and that he introduced appellant to him in order to gain time to dissuade him. The trial court submitted to the jury the fact issue of whether Enright was an accomplice witness, but declined to charge that he was an accomplice witness as a matter of law.

Overton returned to Dallas from San Francisco shortly after the murder but was not prosecuted for his role in the crime (luring Barnes to the Memorex offices and participating in the coverup) in return for his cooperation with the police and prosecutors. The trial court charged that he was an accomplice witness as a matter of law.

At the conclusion of the State's case, appellant took the witness stand in his own behalf and admitted killing Barnes, but he claimed that he did so in self-defense. Appellant testified that he had gone to the Memorex office to persuade Barnes to refrain from blackmailing Oliver. According to appellant, Barnes became violent and attacked him, whereupon he struck Barnes on the head first with a three-hole paper punch and then with a plastic satchel containing a length of pipe. Appellant had brought the satchel or plastic bag containing the pipe with him due to a "premonition that there might be trouble." Appellant testified that all blows struck by him were in self-defense.

■ Appellant's first ground of error contends that there was insufficient evidence to corroborate the accomplice witness testimony. In determining the sufficiency of the corroboration, it is necessary to eliminate the evidence of the accomplice witness and examine the remaining evidence to ascertain if there be inculpatory evidence or evidence of incriminating character which tends to connect the appellant with the commission of the offense. See, e. g.: Rodriquez v. State, 508 S.W.2d 80 (Tex.Cr.App.1974); Cherb v. State, 472 S.W.2d 273 (Tex.Cr.App.1971); Rogers v. State, 461 S.W.2d 399 (Tex.Cr.App.1970). See also: Article 38.14, Vernon's Ann.C. C.P. However,

> "The law forbidding a conviction upon the uncorroborated testimony of an accomplice does not demand that there be direct evidence pointing to the accused as the offender, but merely requires that there be 'other evidence tending to connect the defendant with offense committed.'" Minor v. State, 108 Tex.Cr.R. 1, 299 S.W. 422 (1927). Quoted with approval in Edwards v. State, 427 S.W.2d 629 (Tex.Cr.App.1968), and Miller v. State, 507 S.W.2d 203 (Tex.Cr.App. 1974).

In addition to holding that circumstantial evidence is sufficient to corroborate an accomplice witness, we have also held, "It is the combined cumulative weight of the evidence which supplies the answer to the test." Chambers v. State, 508 S.W.2d 348 (Tex.Cr.App.1974).

■ Looking then to the corroborating evidence, we find appellant's fingerprint on the inside door handle next to the driver's seat of the deceased's car (the trunk of which contained his body). There is also evidence tending to prove flight by appellant after commission of the offense.[1] Appellant left Dallas the day following the night Barnes was murdered. He then remained in California for seven months where, although he used his own name, he made no attempt to contact his family or relatives, failed to obtain a new license plate for his automobile or to use gasoline credit cards which could reveal his whereabouts. In Edwards v. State, 427 S.W.2d 629 (Tex.Cr.App.1968), we held that such an "immediate journey . . . may reasonably be considered as flight," *Edwards* at p. 633.

■ Finally, there is appellant's judicial confession as to the killing, although he testified it was not murder because he had acted in self-defense. It is well established that appellant's admission or confession, under most circumstances, will be sufficient to corroborate the accomplice witness. We reject any contention that the appellant's testimony must be excluded in ascertaining the sufficiency of the evidence to corroborate the accomplice witness because he testified he acted in self-defense. We conclude the evidence was clearly sufficient to corroborate the accomplice witness without any consideration of the witness Enright's testimony.

■ Next, appellant complains that the trial court erred in submitting to the jury the fact issue of whether the witness Mark

---

1. Flight alone, of course, would not be adequate corroboration. Ysasaga v. State, 444 S.W.2d 305 (Tex.Cr.App.1969); Nolley v. State, 368 S.W.2d 218 (Tex.Cr.App.1963).

Enright was an accomplice witness because, according to appellant, he was an accomplice witness as a matter of law. Although Enright introduced appellant and Eugene Oliver, after Oliver inquired about someone to kill Barnes, Enright also testified that he made such introduction in an effort to gain time to convince Oliver not to go through with the crime. His testimony was that he did not willingly participate in the crime. In Allen v. State, 461 S.W.2d 622 (Tex.Cr.App.1970), we held:

". . . where there is any doubt as to the fact that a given witness is an accomplice witness and such fact issue is submitted to the jury, such procedure is sufficient even though the evidence appears largely to preponderate in favor of the fact that such witness is an accomplice as a matter of law." *Allen* at p. 625. Accord: Dears v. State, 506 S.W.2d 606 (Tex.Cr.App.1974); Zitterich v. State, 502 S.W.2d 144 (Tex.Cr.App. 1973); Van Buskirk v. State, 492 S.W.2d 279 (Tex.Cr.App.1973); Lopez v. State, 92 Tex.Cr.R. 97, 242 S.W.2d 212 (1922).

Under the holdings of these cases, we cannot say that the trial court erred in refusing to charge that Enright was an accomplice witness as a matter of law.

■ Ground of error number three also pertains to the court's charge. Appellant contends that he was entitled to a charge on the lesser included offense of aggravated assault. This court has held that in cases where death was caused by a weapon that was not deadly per se or deadly in the manner of its use and where the evidence raises a lack of intent to kill the appellant is then entitled to a charge on aggravated assault. See e. g., Matheson v. State, 508 S.W.2d 77 (Tex.Cr.App.1974). In Corbett v. State, 493 S.W.2d 940 (Tex.Cr.App. 1973), a weapon not deadly in the manner of its use was held to be "one which in the manner of its use, is not ordinarily calculated to produce death." *Corbett* at p. 951. See also: Boazman v. State, 501 S.W.2d 894 (Tex.Cr.App.1973), which stated that whether a weapon was deadly in the manner of its use could be ascertained from "the mode and manner in which it is used, along with the wounds inflicted on the injured party. . ." Boazman at p. 896. Like the instant case, *Corbett* involved a murder in which the deceased was bludgeoned to death by blows from a length of pipe. In *Corbett* we held that refusal to charge on aggravated assault was not error. The same result should obtain in this case.

Appellant attacks the indictment for its failure to sufficiently allege the means used in the commission of the offense and complains of the court's action in overruling his motion to quash. The one court indictment alleged the appellant killed Billie C. Barnes "by beating and striking him with an instrument the exact nature and description of which is to the Grand Jurors unknown."

"The means used to commit the charged offense should be alleged; if not known, that fact must be stated. An averment that the accused killed the deceased in some manner and by some means, instruments or weapons to the grand jurors unknown is sufficient." 29 Tex.Jur.2d, Homicide, Sec. 128, p. 150.

■ The grand jury, of course, must use reasonable diligence to ascertain the nature of the instrument which causes death. Anderson v. State, 479 S.W.2d 57 (Tex.Cr.App.1972). L. B. Strange, foreman of the grand jury, testified that the nature of the instrument causing death was unknown and that a proper effort through detectives had been made to determine its description.

■ Appellant complains that Overton was not called to appear before the grand jury, but his testimony showed he was not an eyewitness to the actual killing and did not know what instrument had been used His appearance would not have thus aided the grand jury. Appellant also seizes upon

the testimony of Dr. Petty, the medical examiner, that the blows to the deceased's head were made "with some kind of a semi-sharp or blunt instrument," and it appears that the grand jury did not attempt to obtain the autopsy report in its quest for a description of the instrument used. The autopsy report is not in the record, and it is not reflected such report contained the medical examiner's description of the instrument. While it might have been better practice to have called the doctor before the grand jury, it is observed that he also testified he could not be specific "nor specifically state the nature of the instrument that caused the wounds," and that forensic pathology is "an inexact science." If it be appellant's contention that the words "blunt and semi-sharp" should have preceded the word "instrument" in the indictment, we reject such contention and fail to see how such omission could have harmed the appellant in any material way. It is clear from the evidence that the precise manner and means were left uncertain until the appellant testified he killed the deceased with a pipe. A similar contention to appellant's was raised in Corbett v. State, 493 S.W.2d 940, 952 (Tex.Cr.App.1973), and decided adversely to the position he takes. See and compare Cavazos v. State, 365 S.W.2d 178, 180 (Tex.Cr.App.1963).

■ By his next two grounds of error, appellant asserts that the trial court erred in admitting hearsay statements of co-conspirators Overton and Enright prior to the existence of any conspiracy and in admitting hearsay statements of the deceased. The single ground of error relating to hearsay statements by Overton and Enright complains of at least twenty-seven separate instances of improper admission of such hearsay. The ground of error relating to hearsay statements by the deceased encompasses at least three separate instances. Our study of appellant's brief and of the record reveals that a number of these statements were admissible, but, more significantly, it fails to reveal precisely how appellant was prejudiced. For present

purposes, however, we decline to ferret out and examine each complained of statements since these two grounds of error are clearly multifarious and thus not in compliance with Article 40.09, Sec. 9, Vernon's Ann.C.C.P. As we said in Hinkle v. State, 442 S.W.2d 728 (Tex.Cr.App.1969),

> "A general and multifarious assignment of error has been expressly held to be improper. The brief, in assigning error, must state the grounds separately."

Hinkle at p. 734. See also: Akridge v. State, 493 S.W.2d 928 (Tex.Cr.App. 1973); Ames v. State, 499 S.W.2d 110 (Tex.Cr.App.1973).

■ Appellant's seventh ground of error challenges the entirety of Robert Overton's testimony as being incompetent. The basis for this challenge is an interview of Overton conducted while he was under the influence of the drug sodium amytal, often described as a "truth serum." Upon his return from California, Overton made several extensive statements to the investigating officers which recounted various details of the murder. Subsequent to these statements, he was given injections of sodium amytal and interviewed by Dr. James P. Grigson, a psychiatrist. During this interview Overton recalled appellant's statement that Barnes must have been Sicilian since he had a hard head. At a pretrial hearing on a motion to suppress his testimony, Overton stated that he had no independent recollection of this remark until he listened to a tape recording of the sodium amytal interview. Overton testified that this had the effect of refreshing his recollection. He also acknowledged that the statement was correct. The trial court then denied the motion to suppress Overton's testimony.

Initially, we note that when Overton testified at trial there was no objection to his testimony as being incompetent. Appellant also concedes that the trial court has great discretion in determining the competency of witnesses. From our study of appellant's brief we have concluded that the real

thrust of his argument is aimed at appellant's remark about Barnes having a hard head. Indeed, it must be so since the rest of Overton's testimony before the jury was not confined to statements first made while under sodium amytal. The difficulty with this position for appellant is that there was no specific objection at trial to the statement of which he now complains. Moreover, the sodium amytal interview was never alluded to before the jury and appellant's testimony during that interview was never introduced. Under these circumstances, we are unable to say that the trial court abused its discretion in admitting Overton's statement.

 In the course of his jury argument at the guilt or innocence stage of the trial, the prosecutor attacked appellant's claim that he killed Barnes in self-defense by arguing that this theory was recently conceived for use at trial. Appellant now advances a ground of error asserting that such argument was outside of the record. The record reveals that the following transpired during the State's cross-examination of appellant.

"Q (Mr. Ormesher) Now in connection with this case, will you tell the jury who the first person was after you were arrested that you told this self defense story to?

"MR. FINSTROM: I would object to that. I believe I was the first person and it would be a privilege (sic) communication. We would object on that basis unless the attorney in asking that had something else in mind.

"THE COURT: Overruled. He would know which one he talked to about it.

"THE WITNESS: I just can't recall.

"Q You didn't tell me about it did you?

"A No.

"Q And you didn't tell Johnny Webb about it?

"A No.

"Q Do you remember Pat Boyd?

"A Who?

"Q Pat Boyd?

"A I remember a Mr Boyd that brought me back on the plane.

"Q That's the one.

"A I don't believe I told him anything about it.

"Q You didn't tell him any story about self defense did you John Craner Jackson?

"A No.

"Q But you told him you killed him didn't you?

"A I don't recall that.

"Q If he testified to that I guess he's lying too?

"A Not at all. Except for you and Johnny Webb in California and my attorney there has never been a time when anyone asked me if I killed a man regardless of circumstances and I said yes I killed him.

"Q But you didn't tell him anything about self defense did you John Craner Jackson?

"A I don't recall telling him how I killed him."

On the basis of this portion of the record, it appears that the argument was adequately supported by the testimony and the inferences which might be justifiably drawn from it.

 Ground of error number nine also presents a claim of improper argument. During this argument at the guilt or innocence phase of the trial, the prosecutor stated: "Ask yourselves why Sargent Charles Ripley of the Los Angeles Police

Department knows John Craner Jackson, why he was looking at him and watching him on January 5th with a felony warrant?" Appellant now contends that this argument implied he had committed some extraneous offense. Yet at trial his objection was, "Your Honor we object to his argument before the jury going behind the testimony of this witness other than the way it was presented." This somewhat nebulous objection did not adequately inform the trial court of the complaint now urged on appeal. The failure to make a specific objection to the issue raised on appeal precludes our review. Campbell v. State, 492 S.W.2d 956 (Tex.Cr.App.1973).

By his tenth ground of error appellant contends that he was denied his attorney-client privilege. Although this ground of error has two distinct components making it multifarious, we are able to discern and evaluate both of them. First, appellant states that prosecution questions regarding a conversation he had with the attorney Fred Bruner denied his attorney-client privilege. Attorney Bruner, however, represented Eugene Oliver and never represented appellant; therefore, the attorney-client privilege never existed between them. Even if there was a fact issue raised as to whether Bruner was appellant's attorney, the trial court's determination of such issue was within its discretion and will not be disturbed on appeal. Maldonado v. State, 425 S.W.2d 646 (Tex.Cr.App.1968).

Appellant also complains of a denial of his attorney-client privilege as to his counsel James P. Finstrom. After appellant testified that he acted in self-defense, he was cross-examined as follows:

"Q Now in connection with this case, will you tell the jury who the first person was after you were arrested that you told this self defense story to?

"MR. FINSTROM: I would object to that. I believe that I was the first person and it would be a privilege (sic) communication. We would object on that basis unless the attorney in asking that had something else in mind.

"THE COURT: Overruled. He would know which one he talked to about it.

"THE WITNESS: I just can't recall."

Inasmuch as appellant's attorney's objection volunteered the very information he was attempting to keep from the jury, we are unable to perceive that appellant has been harmed.

Appellant's next two grounds of error assert that the State was improperly allowed to impeach its own witnesses. The general rule, of course, is that the State may not impeach its own witness unless it shows the testimony to be harmful to its case and that such testimony was unexpected or a surprise. See, e. g., Wood v. State, 511 S.W.2d 37 (Tex.Cr.App.1974). In the instant case, appellant directs one ground of error to the State's being allowed to show that Robert Overton gave prior inconsistent statements before his testimony at trial. The other ground of error asserts that the State was improperly allowed to show that Mark Enright gave prior inconsistent statements and had been convicted of a felony: mail fraud. The general rule, however, has no application to either of these situations because the State was not impeaching its own witnesses.

". . . the term 'impeachment' is broadly used to connote any attempt to discredit the testimony of a witness, it is also used in the narrower sense of such an attack on the credibility of a witness that for the first time evidence as to his credibility becomes admissible." 62 Tex.Jur.2d, Witnesses, § 221, p. 154 (1965). See also: Brown v. State, 475 S.W.2d 938, 952 (Tex.Cr.App.1971).

**176**

Clearly the State was not attacking the credibility of these two witnesses; indeed, its case was dependent upon the jury's believing the truth of their trial testimony.[2] Therefore, the two grounds of error are without merit.

■ Appellant's thirteenth and final ground of error is directed to what appellant claims is the erroneous admission of hearsay statements of co-conspirators. This contention is similar to the two grounds of error complaining of hearsay testimony which have already been considered. Like them, it too is multifarious and fails to comply with Article 40.09, Sec. 9, Vernon's Ann.C.C.P. This ground of error enumerates at least twenty separate instances of such alleged hearsay in addition to "hearsay too extensive to list in detail." As stated before, such failure to comply with Article 40.09, supra, precludes appellate review.

For the reasons stated, the judgment is affirmed.

---

**2.** McCormick and Ray's treatise states three "policy reasons" for the rule prohibiting a party from impeaching his own witness: (1) That a party is bound by the statements of his witnesses. (2) That a party guarantees his witness' general credibility. (3) That a party should not have the means to coerce his own witness. See 1 C. McCormick & R. Ray, Texas Law of Evidence, § 631, p. 479 (2d ed. 1956). The fact that none of these policy reasons is offended by the State's questions to the two witnesses further indicates that no impeachment of them was being attempted.