WR-84,204-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 11/17/2015 2:08:08 PM
Accepted 11/17/2015 4:13:36 PM
ABEL ACOSTA
CLERK

IN THE

COURT OF CRIMINAL APPEALS

ORIGINAL WRIT OR WRIT OF MANDAMUS

RECEIVED
COURT OF CRIMINAL APPEALS
11/17/2015
ABEL ACOSTA, CLERK

AUGUSTINE T. PINK
Texas Bar No. 00784765
2646 SOUTH LOOP WEST #195
HOUSTON, TEXAS 77054
Tel. 713.664.6651
Fax. 713.664.6232
E-MAIL: pinklawfirm@aol.com
ATTORNEY FOR RELATOR,
KEITH PATRICK MCKAY

APPELLANT REQUESTS ORAL ARGUMENT

IN RE KEITH PATRICK MCKAY,

Relator

## IDENTITY OF PARTIES & COUNSEL

Relator certifies that the following is a complete list of the parties, the attorneys, and any other person who has an interest in the outcome of this lawsuit:

| | |
|---|---|
| Keith Patrick McKay | Applicant |
| Augustin T. Pink | Attorney for Relator |
| Respondent | Hon. Pam Fletcher |
| The State of Texas | Donna Gordon Kasper |

# INDEX OF AUTHORITIES

## US SUPREME COURT CASES

Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ………………….………… 25

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) …………………... 10, 16, 17, 19, 20, 21

## UNITED STATES CODE

U.S.C.A. Const. Amend. 6 …………………………………………………………………….…… 10,11

## TEXAS CASES

Barber v. State, 737 S.W.2d 824 (Tex.Crim.App. 1987) ……………………………………………. 17, 20

Caballero v. State, 587 S.W2d 741 (Tex.Crim.App. 1979) ………………………………….………… 17

Clewis v. State, 922 S.W.2d 126 (Tex.Crim.App.1996) ……………………………………………… 25

Ellingsworth v. State, 487 S.W.2d 108 (Tex.Cr.App. 1972) ……………………………………….….. 35

Ex parte Felton, 815 S.W.2d 733 (Tex. Crim.App.1991) ……………………………………………….10

Gonzales v. State, 313 S.W.3d 840 (Tex.Crim.App.2010) …………………………………………… 20

Haynes v. State, 627 S.W.2d 710 (Tex.Crim.App. 1982) (panel op.) ……………………….………… 35

Hernandez v. State, 726 S.W.2d 53 (Tex.Crim.App.1986) ………………………………….………… 10

Huff v. State, 576 S.W.2d 645 (Tex.Cr.App.1979) ……………………………………….………… 34, 35

Huffman v. State, 479 S.W.2d 62 (Tex.Cr.App.1973) …………………………………….………… 34, 35

Johnson v. State, 871 S.W.2d 183 (Tex.Crim.App.1993) …………………………………………….. 25

Jones v. State, 944 S.W.2d 642 (Tex.Crim.App.1996) ……………………………………………… 26

Kepley v. State, 320 S.W.2d 143 (Tex.Cr.App.1959) …………………………….………………… 35

Ex parte LaHood, 401 S.W.3d 45 (Tex.Crim.App. 2013) ……………………………….………….. 16

LaHood v. State, 171 S.W.3d 613 ([14th Dist.] 2005, pets. ref d) …………………………………… 16

Ex parte Martinez, 330 S.W.3d 891, 900 (Tex.Crim.App.2011) ……………………………………… 10

Montoya v. State, 291 S.W.3d 420 (Tex.Crim.App.2009) …………………………….………………20, 23

Moore v. State, 652 S.W.2d 411 (Tex.Cr.App.1983) …………………………………….…………… 35

Morris v. State, 301 S.W.3d 281 (Tex.Crim.App. 2009) …………………………………………… 21

Ortiz v. State, 93 S.W.3d 79 (Tex.Crim.App.2002) .. ………………………………………………… 26

Ross v. State, 133 S.W.3d 618 (Tex.Crim.App.2004) …………………………………………………… 25

Santellan v. State, 939 S.W.2d 155, 164 (Tex.Crim.App.1997) …………………………………….. 25

Sisco v. State, 599 S.W.2d 607 (Tex.Crim.App.1980) …………………………….……………… 16, 19, 21

Thompson v. State, 9 S.W.3d 808 (Tex.Crim.App.1999) …………………………………….……………10

Watson v. State, 204 S.W.3d 404 (Tex.Crim.2006) …………………………………….……………… 26

Williams v. State, 663 S.W.2d 832 (Tex.Crim.App 1984) …………………………………….……… 17, 20

Thrash v. State, 500 S.W.2d 834 (1974) ………………………………………………………….…… 35

Willis v. State, 192 S.W.3d 585 (Tex.App.-Tyler 2006, pet. ref'd)………………………………….… 25

Wood v. State, 511 S.W.2d 37 (Tex.Cr.App. 1974) ………………………….………………..…… 35

## TEXAS CODES

TEX.CODE CRIM. PROC art. 46B.003(a) (2004) ……………………………………………… 20, 21, 22

TEX.CODE CRIM. PROC art. 46B.004(a) ………………………………………….……………… 11,12

TEX.CODE CRIM. PROC art. 46B.004(c) (2004) ……………………………….…….…………… 23

TEX.CODE CRIM. PROC art. 46B.005(b) (2004) ………………………………………………… 20

TEX.CODE CRIM. PROC art. 46B.024 (2004) ……………………………………………….....20, 21

## TREATISES

Texas Law of Evidence, § 692, p. 633 (Tex. Practice, 3d ed. 1980) …………………….……………… 35

**TABLE OF CONTENTS**

IDENTITY OF PARTIES & COUNSEL ................................................................. 2

INDEX OF AUTHORITIES ............................................................................3

STATEMENT OF THE CASE ..........................................................................6

STATEMENT OF JURISDICTION ...................................................................7

ISSUES PRESENTED ....................................................................................8

STATEMENT OF FACTS................................................................................9

ARGUMENT……………………………………………………………… 10

        Issue 1:   TRIAL COUNSEL WAS INEFFECTIVE AND DEFICIENT WHEN HE MADE AN UNREASONABLE DECISION NOT TO INVESTIGATE WHETHER THE DEFENDANT WAS COMPETENT TO STAND TRIAL …………………………………...…… 10

        Issue 2:  THE DNA EVIDENCE WAS LEGALLY INSUFFIENT TO CONVICT APPLICANT OF SEXUAL ASSAULT………………………… 25

        Issue 3:  THE APPLICANT'S COUNSEL WAS INEFFECTIVE AT THE TRIAL ON THE MERITS ………………………………… 34

PRAYER...................................................................................……………… 45

VERIFICATION………………………………………………………………. 46

CERTIFICATE OF WORD COUNT ………………………………………… 47

CERTIFICATE OF SERVICE ................................................................... 47

**IN RE KEITH PATRICK MCKAY,**

**Relator**

---

**RELATOR'S PETITION FOR WRIT OF MANDAMUS**

---

Applicant, Keith Patrick McKay, submits this petition for writ of mandamus complaining of the order of the Honorable Pam Fletcher of 349th Judicial District Court, Houston County, Texas.

## STATEMENT OF JURISDICTION

This Court has jurisdiction to issue a writ of *mandamus*. Tex. Gov't Code §22.221(a); *see* Tex. Const. art. 5, §6(a).

## ISSUES PRESENTED

Issue 1:

TRIAL COUNSEL WAS INEFFECTIVE AND DEFICIENT WHEN HE MADE AN UNREASONABLE DECISION NOT TO INVESTIGATE WHETHER THE DEFENDANT WAS COMPETENT TO STAND TRIAL.


Issue 2:

THE DNA EVIDENCE WAS LEGALLY INSUFFIENT TO CONVICT APPLICANT OF SEXUAL ASSAULT.

Issue 3:

 THE APPLICANT'S COUNSEL WAS INEFFECTIVE AT THE TRIAL ON THE MERITS.

**STATEMENT OF FACTS**

Applicant, in Cause Number 05-CR-005, the Trial Court in Houston County, 349th Judicial District, Keith P. McKay, was sentenced for (1) Aggravated Sexual Assault, (2) Injury to an elderly individual (3) Burglary of a habitation, and (4) Burglary of a habitation with intent to commit an assault. A jury found that McKay was guilty and sentenced him to 99 years in the Texas Department of Corrections.

On July 26, 2005, the trial court signed a judgment on the jury's verdict for McKay. McKay filed for Appeal on April 5, 2006. Appeal was denied.

In the underlying case the Complaining Witness, lived in Crockett, Texas. On October 25, 2005 someone broke into her house and assaulted her. After the assault, the Complaining Witness drove herself to her neighbor's place of residence and requested that they contact the police. When asked what happened by the neighbor, the Complaining Witness replied the boy next door beat me up, without giving any physical description of the individual or naming him. The police searched the Complaining Witness's home and collected finger print samples, blood samples from the sheets and a foot print sample. However, none of the physical evidence linked Applicant to the offense.

**ISSUE I**

**TRIAL COUNSEL WAS INEFFECTIVE AND DEFICIENT WHEN HE MADE AN UNREASONABLE DECISION NOT TO INVESTIGATE WHETHER THE DEFENDANT WAS COMPETENT TO STAND TRIAL.**

A defendant has a Sixth Amendment right to effective assistance of counsel. U.S. CONST. AMEND. 6; See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Ineffective assistance of counsel claims are cognizable on habeas review, and to determine whether to grant habeas relief for ineffective assistance of counsel, Texas courts apply the standard set forth- in Strickland. See Ex parte Martinez, 330 S.W.3d 891, 900 (Tex.Crim.App.2011); Hernandez v. State, 726 S.W.2d 53, 55-56 (Tex.Crim.App.1986). The Strickland standard requires that an applicant establish two components by a preponderance of the evidence: (1) deficient performance of trial counsel and (2) harm resulting from that deficiency sufficient to undermine confidence in the outcome of the trial. Strickland, 466 U.S. at 687, 104 S.Ct. 2052. The proper standard of review for claims of ineffective assistance of counsel is whether, considering the totality of the representation, counsel's 'performance was ineffective. See Thompson v. State, 9 S.W.3d 808, 813 (Tex.Crim.App.1999) (citing Ex parte Felton, 815 S.W.2d 733, 735)(Tex. Crim.App.1991).

The prejudice portion of Strickland inquiry regarding ineffective assistance of counsel is whether defendant can show that there was a reasonable probability that he would have been found incompetent to stand trial if the issue of competency had been raised and fully considered; because, under Texas law, even though there are conditions precedent that must be met to obtain a trial on competency, the only way the outcome of the guilt phase of the proceeding would be different is if the defendant proved that he was

incompetent to stand trial, and anything less than a finding of incompetence would not have changed the outcome. U.S.C.A. Const. Amend. 6.

The Court of Criminal Appeals beings its analysis of counsel's performance with a strong presumption that the counsel's actions falls within the wide range of reasonable professional assistance. U.S.C.A. Const. Amend. 6.

One necessary facet of attorney's professional assistance to defendant is the investigation of the facts and law applicable to the case; counsel has a duty in every case to make a reasonable investigation or a reasonable decision that an investigation is unnecessary. U.S.C.A. Const. Amend. 6.

When assessing the reasonableness of an attorney's investigation as part of evaluation of whether defendant received ineffective assistance of counsel, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further. U.S.C.A. Const. Amend. 6.

An attorney's deficient performance prejudices an accused when there is a reasonable probability that the outcome of the trial would have been different but for counsel's deficiency. U.S.C.A. Const. Amend. 6.

Further, the statutory duty of a judge to suggest that a defendant may be incompetent to stand trial should not be confused with counsel's obligation to make a reasonable decision to investigate and to raise relevant issues to protect the client as required to avoid ineffective assistance of counsel. U.S.C.A. Const. Amend. 6; Vernon's Ann. Texas C.C.P. art. 46B.004(a).

The issue of defendant's incompetency to stand trial must first be raised by either a party to the case or the trial court; but, a trial court is not authorized to initiate an informal inquiry to determine a defendant's competency, unless the evidence of incompetency is sufficient to raise a bona fide doubt in the mind of the judge as to whether the defendant is legally competent. Vernon's Ann.Texas C.C.P. art. 46B.004(a).

In the case at bar, the Applicant contends that his sentences should be overturned and/or granted a new trial, because Defense Counsel rendered ineffective assistance of counsel by failing to raise the issue of the Applicant's mental health and that he was not competent to stand trial.

The Applicant contends that his Defense Counsel knew and/or should have known that he was mentally ill and incapable to assist him in the preparation of his cases; further the Applicant contends that Defense Counsel knew that he did not understand the legal process, the charges against him or the possible sentence that could be imposed.

The record will show that Attorney Forrest Phifer represented the Applicant at trial for the felony offenses for which he was convicted and is now seeking a writ of habeas corpus. Further, Attorney Phifer was aware that the Applicant suffered from mental illness, because she represented the Applicant in June of 2004 on a misdemeanor charge. In that case, Attorney Phifer asked for and was granted an Order by the Court to have the Applicant's competency examined.

The Applicant contends that because Attorney Phifer never presented these issues to the trial court at any stage of the trial in the case before this Court, Attorney Phifer's representation was ineffective.

During the punishment phase of the Applicant's trial, outside of the presence of the jury, the Applicant testified to the following:

Mr. McKay, your attorney has indicated to me that he would like to ask you a few questions. And I want to know that if he asks you questions, will you answer him honestly?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And you will be truthful in your answers?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.

KEITH PATRICK MCKAY,

after having been first duly sworn, testified as follows:

BY MR. PHIFER:

Q.  Mr. McKay, a few minutes ago I -- we were talking about the punishment phase of this hearing.  And I asked you if you wanted me to contact your grandmother or your mother or anyone that you wanted to come to speak. And you told me that you had no one; is that correct?

A.  Yes, sir.

Q.  And at that same time I started talking about the possible sentences time or punishment. And you basically said don't argue probation but argue time. Don't do nothing; is that correct?

A.  That is right. Because I didn't do this.  God knows I didn't do this.

Q.  You understand that during the punishment phase the state is going to be arguing for something, probably time? But you are telling me to do -- don't argue for time. Don't argue for probation?

A.  I just have to sit down. Because I didn't do this. You are not understanding I didn't do this. I cannot put it in my mind on something that I didn't do. God know I didn't do this.

Q.  Are you telling me to do absolutely nothing?

A.  Nothing. I didn't do this. ask you a few questions to make sure that you understand something.  Okay?

Q.  Yes, ma'am.  probation. That's the one choice that the jury has. And the other choice that the jury has is whether to sentence you to time in T.D.C.J. on the two cases that are first-degree felonies of the aggravated assault and the injury. The range the jury has is five to 99 or life in prison. And the two burglaries it's two to 20 years in prison. Do you understand that that's he time possibilities?

A.  (Witness is raising his hands.) Ma'am, you can --

Q.  No. No.  I don't want to know whether you did anything, you didn't do anything.  I just want to know if you understand that that is the range of punishment?

THE COURT:  Yes, ma'am.  believes you should put on witnesses and ask for probation. Do you understand that?  Do you understand what I'm saying?

A.  But why should I tell you something that I didn't do, ma'am?

13

Q. Well, at this point you're either going to prison, or you're going on probation. It's one or the other.

A. Well, I --

Q. No, no, no. Stop. Stop.

A. I just have to go to prison, ma'am, and sit down on appeal. Because I'm not going to sign up for nothing 1 didn't do.

Q. I just want to make sure that you understand the decision that you are making. Because either choice --

A. I understand. I'm God's son.

Q. No. Do you understand that?

A. (Shook head no.)

Q. You don't understand that? If you want more time to talk to Mr. Phifer --

A. I don't --

Q. -- about what about witnesses you should or should not call at this stage of the trial? Would you like time to visit with him about that?

A. God is my witness, ma'am. God is my witness.

Q. Would you like more time to talk to Mr. Phifer?

A. Ma'am, I don't need time.

Q. Okay.

THE COURT: Mr. Phifer - -

A. I didn't do this.

THE COURT: -- do you have any additional questions you would like to ask Mr. McKay?

MR. PHIFER: No further questions.

THE COURT: Okay. I have got to let you have the opportunity to make an opening statement if you would like to make one.

THE DEFENDANT: I didn't do this. God know I didn't do this. Everybody in this courtroom know I didn't do this.

THE COURT: If you have been sworn as a witness and you're in the courtroom, I need for you to leave the courtroom.

MS. GARNER: I think we are going to be able to stipulate to same additional testimony. It's just going to take just a second, Judge.

(Witnesses left the courtroom.)

THE DEFENDANT: Where is you at? Where is you at. I didn't do this. I did not do it. I didn't do it. I didn't do it. This is not me. This is not me. I didn't do this. You can't put me in jail. I will do whatever that you tell me to do until I get appealed. I did not do this, sir. I didn't do this. I didn't. I did not do this.

THE DEFENDANT: But I didn't do this. Could you please tell me where you are at? Where is your Father when you need him? I don't care. I didn't do it.

THE COURT: We need to go back on the record.

Mr. McKay, there's a few things based upon what you've said in open court, the Court needs to advise you of several things. One, you will have a

right to appeal. However, if the Appellate Court believes that the Trial Court acted properly, they will affirm the jury's decision of whatever the punishment and their verdicts are.

THE DEFENDANT: Well, I have to go to Supreme Court.

THE COURT: I just said -- okay. You can go to the Supreme Court. But there will be a time that there is a potential that what was done at this Trial Court level could be found to have been proper. Therefore, if that were to occur, whatever sentence or sentences, whether it's probation or prison, whichever it may be, will be imposed against you at the conclusion of the appeal. I think that you have got to be smart.

THE DEFENDANT: I am smart, Your Honor.

THE COURT: Okay.

THE DEFENDANT: Why would I sign for -- if you was here and you know you didn't do it, why would you sign for something you didn't do? That would be outrageous.

THE COURT: Mr. McKay, you're not going to sign up for prison. And you are not going to sign up for probation. The question is: Is do you want evidence -- and I don't want you to answer this question. I'm just making a statement to you. The question is whether your side puts an evidence to give the jury a choice of probation and prison time, or you don't put an evidence giving them a choice. You don't choose what's going to happen to you. I don't choose what's going to happen to you. The state is not going to choose what is going to happen to you. The 12 people that found you guilty are going to decide your fate. And the lawyer wants you to put on evidence to support your side. So you have indicated to him in open court you don't want him to do that. And I am strongly, strongly telling you I think that's bad. And I don't think you are thinking intelligently. And I don't think you are smart.

THE DEFENDANT: I'm God's -- I'm God's

MR. PHIFER: If I may ask Mr. McKay a few questions. I want to be absolute certain of my instructions, Mr. McKay. I told you I would like to call your grandmother, your mother, other people to come in. I have asked you for any names of people to come in to testify an probation. And you've told me not to.

THE DEFENDANT: I don't take probation. I haven't done nothing. Ya'll are not getting that through y'all's head. I haven't done nothing. The person who has done this is out here roaming and still is doing it.

MR. PHIFER: Do you want me to call anyperson?

THE DEFENDANT: I don't want – need you to call anyone. I have God with me at all time. That is the only person I need. He could raise me. He made me. He shake me. He mold me. Let me be free.

MR. PHIFER: Do you want me to talk to the jury about giving a lesser sentence or a probation or whatever?

THE DEFENDANT: I don't need no lesser sentence. You can chunk 2,000 years at me. I'm not fixing to sign for this because I didn't do it.

In Ex parte LaHood, 401 S.W.3d 45 (Tex.Crim.App. 2013) the Applicant was

convicted of aggravated kidnapping and aggravated sexual assault. On direct appeal, the

15

Fourteenth District Court of Appeals affirmed his convictions in a published opinion. LaHood v. State, 171 S.W.3d 613 [14th Dist.] 2005, pets. ref d). The court subsequently refused his petitions for discretionary review. Applicant then filed an application for a writ of habeas corpus alleging, in part, that he received ineffective assistance of counsel because his trial counsel failed to investigate his mental-health history, and if his counsel had, there was a reasonable probability that the outcome of his proceeding would have been different. The trial court entered findings of fact and conclusions of law recommending that the court deny relief. The court denied relief.

After considering the additional information, the Habeas Corpus Court again recommended denying relief. Based on the additional findings of fact and conclusions of law made by the trial court, the Habeas Corpus Court filed and set the applications and ordered the parties to brief the following:

1. Whether trial counsel, under Strickland v. Washington, 466 U.S. 668; 104 S.Ct. 2052, 80 L.Ed.2d 6741 (1984), was deficient for not bringing evidence of Applicant's alleged incompetency to the trial court's attention, either before or during trial.

2. Assuming trial counsel was deficient for failing to alert the trial court to the alleged incompetency, whether Applicant was harmed by counsel's actions under Strickland and how the determination of harm should be made considering this court's holdings in Sisco v. State, 599 S.W.2d 607 (Tex.Crim.App.1980), Barber v. State, 737 S.W.2d 824 (Tex.Crim.App. 1987), Williams v. State, 663 S.W.2d 832 (Tex. Crim.App 1984), and their progeny.

16

3.   Assuming deficient performance and resulting harm are shown under Strickland v. Washington 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed. 2d 674] (1984), whether the proper remedy is to order a retrospective competency inquiry or to grant a new trial.  See, e.g., Barber v. State, 737 S.W2d 824 (Tex.Crim.App. 1987); Caballero v. State, 587 S.W2d 741 (Tex.Crim.App. 1979).

The court stated that their analysis of counsel's performance starts with a strong presumption that trial counsel's actions fell within the wide range of reasonable professional assistance.

Applicant argues that his trial counsel observed evidence of his lack of mental health before trial, at his trial, and during the sentencing phase.  He contends that his trial counsel's failure to follow up on the various information of his alleged incompetency fell below prevailing professional standards and, as a result, her performance was constitutionally deficient.  The court agreed.

In trial counsel's affidavits, she described her client as having a "misogynistic attitude with a need to dominate and exercise control over women...." She also stated that Applicant was a malingerer and "engaged in . . . antics designed to create the illusion of incompetency, but which appeared to be nothing more than an act" To support her assertions, she cites pages of cogent notes written by Applicant during trial, but she did not locate the notes in question.  She did acknowledge, however, that Applicant told her he was bipolar and was prescribed Zoloft, Risperadol, and Zyprexa. She also stated that a mental-health pretrial screening sheet for Applicant related to a prior sexual-assault case indicated that he had an alcohol dependency problem, was bipolar, and was prescribed Lithium, Prozac, and Lidicin.  Although the record did not reveal when that screening

17

took place, it showed that Applicant had previous mental-health issues. Moreover, trial counsel admits that Applicant was on medications for his mental illness and that, without his medication, he could become incompetent.

In addition, further evidence revealed that the Applicant's father stated in his affidavit that trial counsel never called him, and he didn't speak with her for the first time until he called her about a week before trial. He explained that, during their conversation, he told her about his son's mental illness and need for his medications. But trial counsel stated that she did not recall any family members telling her that "Applicant had any mental-health history that would make him legally incompetent, even though he may have mental health issues." In addition to Applicant's father, Applicant's ex-wife stated that she told trial counsel that she had important information concerning Applicant's mental-health history, including how his illness and drugs and alcohol have affected him. She also asserts that trial counsel never called her to testify in the guilt phase, even though she was present in the courtroom when Applicant was found guilty. In short, the record shows that trial counsel thought Applicant had mental-health issues but was competent to stand trial, and she came to this conclusion despite speaking with Applicant, his father, and Applicant's former wife.

At trial, new signs of Applicant's potential mental instability arose. During the guilt phase of the trial, Applicant engaged in multiple outbursts and claimed that be was not receiving his required psychoactive medications in jail. For example, on the second day of his testimony, Applicant complained that he was having difficulty understanding the proceeding and that he was seeing lights blink. After these statements, the trial court recessed the proceeding for the day. Trial counsel believed that she did not need to

18

suggest that her client was incompetent to stand trial because the court took breaks to accommodate Applicant before ultimately recessing for the day. But the statutory duty of a judge to suggest that a defendant may be incompetent to stand trial should not be confused with counsel's obligation to make a reasonable decision to investigate and to raise relevant issues to protect the client. This is especially so when counsel's belief as to a medical issue is based on her own lay opinion, even though she knew Applicant had mental health issues in the past and was taking medications that gave him, in her estimation, a "substantial probability of regaining competency" Applicant's medical records from the jail were easily accessible and contained significant information (including evidence of a suicide attempt during the trial) that could have allowed his attorney to assert that he was incompetent. After reviewing the quantum of evidence known to counsel before and during trial, and whether the known evidence would lead a reasonable attorney to investigate further, the court concluded that trial counsel's failure to further investigate was unreasonable under the circumstances.

The court also held that the Applicant was not prejudiced because there was not a reasonable probability that the fact-finder would have found Applicant incompetent to stand trial.

Having decided the trial counsel's performance was deficient, the court then turned to the question of whether Applicant was harmed by counsel's actions under Strickland v. Washington, 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), and how the determination of harm should be made considering this court's holdings in Sisco v. State, 599 S.W.2d 607 (Tex.Crim.App. 1980), Barber v. State, 737 S.W.2d 824

19

(Tex.Crinl.App.1987), Williams v. State, 663 S.W.2d 832 (Tex.C&.1984), and their progeny.

The Supreme Court's prejudice standard in a Strickland analysis is flexible and must be applied in many different contexts. For that reason, review the relevant competency laws and Strickland cases to resolve how Applicant can prove prejudice in this context and, ultimately, whether he was prejudiced and entitled to relief.

At trial, the issue of incompetency must have first been raised by either a party to the case or the trial court. See TEX.CODE CRIM. PROC. art. 46B.004(a), (b) (2004) (allowing either party or the trial court to suggest that the defendant may be incompetent to stand trial). But regardless of whether a party or the trial court was the one to make such a suggestion, a trial court was not authorized to initiate an informal inquiry to determine a defendant's competency unless the evidence of incompetency was "sufficient to raise a bona fide doubt in the mind of the judge whether the defendant [was] legally competent." Montoya v. State, 291 S.W.3d 420, 425 (Tex.Crim.App.2009); see Gonzales v. State, 313 S.W.3d 840, 841-42 (Tex.Crim.App.2010). Assuming that the court harbored a bona fide doubt, then it initiates an informal inquiry to determine if "there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." TEX.CODE CRIM. PROC. art. 46B.004(c) (2004). The Court has held that is "to assay just that evidence tending to show incompetency, putting aside all competing indications of competency, to find whether there is some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetency." If the judge finds "some evidence" in the record that "rationally may lead to a conclusion of incompetency[,]" then a trial within a trial should be held on the

issue of the defendant's competency. TEX.CODE CRIM. PROC. art. 46B.005(b) (2004); Sisco at 614. Thus, the determination of competency is not decided unless the court holds a trial to determine competency, which is authorized only if the court has a bona fide doubt that the defendant is not competent and, after assaying the evidence, it finds some evidence that the defendant is incompetent. See Morris v. State, 301 S.W.3d 281, 237 (Tex.Crim.App. 2009).

Article 46B.003(a) states that a person is incompetent to stand trial if the person does not have (1) "sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding" or (2) "a rational as well as factual understanding of the proceedings against the person." TEX.CODE CRIM. PROC. arts 46B.003(a) (2004); see Strickland, 466 U.S. at 695 ("The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's errors."). The Court has stated that the factors experts use in conducting a competency evaluation are also helpful to the fact-finder in determining the broader question of competency. See Morris at 286 n. 10; see also TEX.CODE CRIM. PROC. art. 46B.024 (2004). These factors include whether a defendant can (1) understand the charges against him and the potential consequences of the pending criminal proceedings; (2) disclose to counsel pertinent facts, events, and states of mind; (3) engage in a reasoned choice of legal strategies and options; (4) understand the adversarial nature of criminal proceedings; (5) exhibit appropriate courtroom behavior; and (6) testify.

The court held that trial counsel's decision to not investigate Applicant's mental-health history was unreasonable and constituted deficient performance, but Applicant has not demonstrated prejudice because he has not shown that there is a reasonable

probability that, but for counsel's deficiency, he would have been found incompetent at an incompetency trial. The Court did not reach the third question filed and set for its review—the proper remedy if prejudice had been found—because Applicant cannot show that he was prejudiced.

In our case, the Applicant contends that he was never mentally competent to stand trial based on his mental history. That based on his outward behavior during the course of trial, that his defense counsel or the trial judge should have had his present mental status and mental health history investigated.

It was clear that the Applicant did not have a sufficient present ability to consult with his attorney with a reasonable degree of rational understanding. The Applicant did not and could not comprehend the importance to call witnesses to testify on his behalf as to his character, nor did he understand that his attorney needed to argue for probation or a minimum prison sentence during the punishment phase of his trial. The Applicant, at that point, was eligible for probation on all charges because he had never been convicted of any felonies or had never been placed on felony probation. In the State of Texas or any other state located in The United States.

When the Applicant testified to the court that he did not understand what his attorney was asking from him and his failure to respond to the court in a rational as well as a factual understanding of the proceeding against him. The Texas Code of Criminal Procedure Article 46B.003(a) (2004). The court should have found some evidence in the Applicant's complete failure to have a sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding, which was sufficient to raise a bona

fide doubt in the mind of the judge whether the Applicant was legally competent. Montoya v. State, 291 S.W.3d 420, 425 (Tex.Crim.App. 2009).

The Applicant contends that the trial court had evidence from the Applicant's bizarre responses and lack of understanding to the proceeding that would have supported a finding that the Applicant may have been mentally incompetent to stand trial. (Tex.Code. Crim. Proc. art. 46B.004(c) 2004).

Further, trial counsel had prior knowledge of Applicant's prior mental issues. In fact, trial counsel asked the misdemeanor court, wherein applicant's counsel also represented applicant, to conduct a mental exam. Further as to the second prong set forth in Strickland as to weather the applicant would be harm by counsel's failure to investigate, the answer to this question is yes.

The Applicant was harmed by not being able to assist his attorney with the preparation of his case, the ability to make rational decisions during the punishment phase of his case, by not understanding the magnitude and the consequense of asking for probation, for which he was eligible. Finally, the applicant was not able to Use legal term here to say that he was not able to comprehend and assist in the legal case against him.

Further the outcome of the Appellant's case would have been different if, in fact, he was competent to stand trial he would have been able to assist his lawyer with the cross examination of the states key witness to show their inconsistencies. Also, Appellant would have been able to ex[plain his whereabouts and his alibi. Appellant would have testified that there was no DNA taken from the crime scene that linked the appellant to it. Appellant would have also testified that he has never been to the victims

home. Finally, the outcome of the case would have been different because if the Appellant was in his right state of mind, the appellant would have presented more alibi witnesses as to his whereabouts on the night in question. Appellant's conviction should be overturned and a new trial granted.

**ISSUE II**

**THE DNA EVIDENCE WAS LEGALLY INSUFFIENT TO CONVICT APPLICANT OF SEXUAL ASSAULT.**

Appellant argues that the evidence is factually insufficient because his DNA was not found during the physical examination of the complaining witness. Appellant argues that the absence of his DNA is inconsistent with the verdict and that the verdict is clearly wrong. The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence. *See Jackson v. Virginia,* 443 U.S. 307, 315-16, 99 S.Ct. 2781, 2786-87, 61 L.Ed.2d 560 (1979); *Ross v. State,* 133 S.W.3d 618, 620 (Tex.Crim.App.2004); *Willis v. State,* 192 S.W.3d 585, 592 (Tex.App.-Tyler 2006, pet. ref'd). Evidence is not legally sufficient if, when viewing the evidence in a light most favorable to the verdict, the Court concluded that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *see also Johnson v. State,* 871 S.W.2d 183, 186 (Tex.Crim.App.1993).

While legal sufficiency is all that is required by the U.S. Constitution, the Texas Court of Criminal Appeals has determined that the Texas Constitution requires review of the factual sufficiency of the evidence. *Clewis v. State,* 922 S.W.2d 126, 129-30 (Tex.Crim.App.1996). In conducting a factual sufficiency review of the evidence, we must first assume that the evidence is legally sufficient. *Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997). The Court reviews the factual sufficiency of the evidence to determine whether, considering all the evidence in a neutral light, the evidence supporting the conviction is too weak to withstand scrutiny or the great weight and preponderance of the evidence contradicts the jury's verdict to the extent that the verdict

is clearly wrong and manifestly unjust. *See Watson v. State,* 204 S.W.3d 404, 414-15, 417 (Tex.Crim.2006). A verdict will be set aside "only if the evidence supporting guilt is so obviously weak, or the contrary evidence so overwhelmingly outweighs the supporting evidence, as to render the conviction clearly wrong and manifestly unjust." *Ortiz v. State,* 93 S.W.3d 79, 87 (Tex.Crim.App.2002). A clearly wrong and manifestly unjust verdict occurs where the jury's finding "shocks the conscience" or "clearly demonstrates bias." *Jones v. State,* 944 S.W.2d 642, 648 (Tex.Crim.App.1996).

In the case at bar, the evidence was insufficient for the following reasons:
1.   No DNA
2.   No Finger Prints
3.   Victim said it happened at one time, however the Dr. Said it could not have happened at that time.
**4.**   Appellant had an alibi at the time that the victim indicted that she was assaulted.

### A.

### FINGERPRINTS AND DNA

The Applicant argues that it has been well established that forensic evidence such as finger prints, foot prints, and biological DNA has been a useful tool in the aid of solving thousands of criminal cases and also has been useful in freeing many falsely accused Defendants. The Applicant argues that his convictions should be overturned based on the facts that during his trial, there was no forensic or scientific evidence that was submitted or testified to that linked or connected him to the crimes against the victim.

The victim stated that her assailant was not wearing gloves when he attacked her. She testified as followed:

**Cross-examination**

Q:    Do you recall whether he had gloves on or was he hitting you with just bare fists?
A:    Bare fists.

During the testimony of the victim, it was well established that the assailant had plenty of opportunities to leave behind fingerprints on numerous objects.

On direct examination the victim testified as followed:

Q.    I think you said in one of your reports that he may have pulled a phone out of the wall?
A.    He did pull the phone out of the wall. On the outside he pulled the phone out.

On cross examination, she testified to the following:

Q.    Okay. Did he take the phone out of the wall before he started attacking you?
A.    Oh, yeah, he did that from the outside.
Q.    I'm sorry?
A.    He did that from the outside.

The attacker had an opportunity to have left prints on the telephone box outside and the telephone itself.

The Applicant argues that an assailant that was not wearing any gloves should have left behind some or at least one print. The victim also testified that her attacker grabbed her front door, the one that the attacker knocked down with his bare hands to put it back up.

The Applicant argues that the leading investigating officers did not find any evidence that connected or linked him to the crime against the victim. During the testimony of the officer's, they testified to the following:

A.    Officer Michael Calvin:
Q.    Were you present when fingerprints were taken? Things like that were taken?
A.    Yes, I was.
Q.    Okay. Was fingerprints taken from the -- or

27

efforts taken to take fingerprints from the door?

A. Yes.

Q. Were efforts taken to take fingerprints from the telephone?

A. Yes.

Q. Was there a footprint on the door?

A. Yes. It was a shoe print.

Q. A shoe print? And was efforts taken to take the shoe print from that door.

A. Yes.

Q. Did you at that time secure the bed linings with the blood on it and the door?

A. All of that was secured when the investigator went over there.

Q. Okay. And when was that?

A. It was probably an hour or so later.

Q. Okay. After around 8:45?

A. Yes.

Q. When you arrived at the residence, which door did you enter? The front door or the side door?

A. The side door.

Q. Was there anything on the handle of that door? That side door?

A. Inside when -- after I had made entry inside, on my way out, I noticed it was a yellow Dollar Store bag on the door.

Q. And was there blood on that at all?

A. Yes, it was.

Q. And do you know if that bag was also taken into custody?

A. Yes, it was.

Q. Okay. When you found -- or were you the one that found Mr. McKay that morning?

A. It was Corporal Mike Harrell.

Q. Okay. Do you know when he was taken into custody?

A. Mike called me over there. And I transported him to the jail and booked him in.

A. I can't remember the time.

Q. Would it be fair to say it was around 10:00 o'clock in the morning?

A. Maybe so.

Q. Okay. When you took him to custody was there any blood an Mr. McKay's clothing?

A. No.

Q. Was there any blood an Mr. McKay's hands,

28

his face, anywhere?

A. No.

Q. What was Mr. McKay wearing; do you recall?

A. I -- to my recollection 1 think he had on some blue shorts and some black tennis shoes and some kind of hooded top.

Q. Okay. Hooded shirt?

A. Yes.

B. Officer Walter Stanley:

Q. Okay. In connection with your investigation of this case did you recover any -- any items of evidence?

A. Yes, ma'am. The sheets and Ms. Trubie's gown was recovered.

Q. Did you attempt to recover any other evidence?

A. Fingerprints. Yes ma'am.

Q. Okay. Where did you examine for fingerprints?

A. On -- on the front door of the building and also there in the door going into the bedroom.

Q. Okay. I'm going to show you -- I want to show you what has been marked as State's Exhibit 4, which is the front door of Ms. Trubie's house. And what area -- you can come down here and show us what area you looked for for fingerprints.

A. Basically - -

Q. Can you see?

A. When a person normally opens a door -- Let's do it from this side because we've got one juror who can't see over your belly.

A. These are the fingerprints an the side of the door where the doorknob is.

Q. Okay. All right. And so you fingerprinted this area over here where the lock and the doorknob was?

A. Yes, ma'am.

Q. Okay. And then that is the exterior view, and here is the interior view?

A. Yes, ma'am.

Q. All right. Do you remember where you attempted to recover prints here?

A. On the door on the facing and also at top of the door.

Q. Okay. And then I believe that you did it going back into the bedroom, the bedroom area. And so if this is the front door here, are you talking about this door here?

A. Yes, ma'am.

29

Q.  Okay. Was it your understanding that Mr. McKay entered from the front door and went directly into the bedroom, and that's why you followed this area of this course of --

A.  Yes, ma'am. development of fingerprints or the recovery of fingerprints --

A.  Yes, ma'am.

Q.  -- evidence?

A.  Yes, ma'am, I have.

Q.  Okay. And do you recall where you received that training?

A.  Oh, it has been several years ago. Yes ma' am.

Q.  Okay. So have you been doing that just in your general job for quite some time?

A.  Yes, ma'am. Pretty well almost every day. Yes, ma'am.

Q.  Okay. Now, in connection with this case were you able to develop any fingerprints?

A.  No, ma'am, I was not.

Q.  Are you able to develop fingerprints in

Q.  Okay. And could you leave finger – would you leave fingerprints if you were wearing gloves?

A.  No, ma'am.

Q.  Would you leave fingerprints if you just kicked a door down and didn't touch the door?

A.  No, ma'am.

Q.  Okay. And, in fact, in this case you were able to recover a footprint --

A.  Off the door.

Q.  -- of some sort off the door?

A.  Yes, ma'am.

Q.  Were you ever able to match that with any known source?

A.  No, ma'am.

Officer Stanley testified that there were no prints that matched Mr. McKay, the Applicant or foot prints that matched the sizes of tractions on his shoes. Officer Stanley also testified that the Applicant had a cut on his finger which could indicate that the attacker could have been bleeding from that cut. There was no blood found that matched the Applicant.

The Applicant contends that during his trial, the State called a crucial witness in his case that supported the fact that there was no DNA evidence found at the crime scene that connected or linked him to the crime. The State called Ms. Amy Smuts as their

expert Forensic Analyst. Ms. Smuts was responsible for matching or determining if the Defendant's DNA matched with the sample taken from the crime scene. Ms. Smuts testified to the following:

Q. How do you go about taking an unknown sample, extracting it from something and then comparing it to something known?

A. There are different procedures to do that. Basically, when we are given a sample, we take into consideration the type of sample that it is, evaluate it, and decide what's the best extraction procedure to use to get the DNA out of that particular sample.

Q. Okay. Now, we sent you three different things; is that correct, to extract from?

A. That is correct.

Q. And they were a sheet, a nightgown, and a plastic bag; is that correct?

A. No. That is not correct.

Q. Okay. What did we send you?

THE WITNESS: May I refer to my notes?
THE COURT: You may.

A. (BY THE WITNESS) I was sent -- I'm sorry. I misspoke. I was sent a swab that was thought to be vomit, a yellow shopping bag, and then two known samples.

Q. (BY MS. KASPAR) Okay. And I mentioned a sheet. Had you had some discussions with individuals here in Houston County about the testing of a sheet?

A. Yes, I had.

Q. Okay. But you did not get that sheet and did not make any analysis of it?

A. No, I did not.

Q. And I will get to that momentarily. But let me ask you. Let me start with the bag. It was a plastic shopping bag; is that correct?

A. That is correct.

Q. Okay. And when you saw that it was a plastic shopping bag, what sort of extraction method did you decide to use on it?

A. What I did with the bag was I did what's called a presumptive test first. It was stained. And I did what's called a presumptive test to make sure that the stain on it was blood. And it did test positive for blood. So I just did what -- what is called a Kelax extraction. And that's just a basic extraction procedure to -- again, to get the DNA out of the blood cells.

Q. And once you had the DNA out of the blood cells itself, what's your protocol with regard to testing that?

31

A.    Then we do what is called an amplification. And that's basically to take what DNA exists from that blood sample. And we amplify that to get basically a lot of copies of what DNA exists in that sample so that there is basically enough. It is kind of like a Xeroxing so that we have enough sample that's actually there to -- to -- so that we can physically look at it. And then it's run through what is called a capillary electrophoresis machine. And so that can actually help us visualize what DNA is actually there so that we can sort of see what we're looking at.

Q.    Okay. Once you had withdrawn the DNA and come up with a profile, did you then try to match it with two known samples that we sent to you?

A.    Yes. We did -- I did compare it to the two known samples that I was sent.

Q.    And those samples were from Trubie Moore and Keith McKay?

A.    That is correct.

## Cross Examination

Q.    Okay. And neither of those samples matched up with Mr. McKay; is that correct?

A.    That is correct.

Q.    In fact, the blood on the plastic bag, would it be fair to say that Mr. McKay is excluded from being the donor of that blood?

A.    That is correct.

Q.    Were there any other problems that prohibited a -- or that contributed to your testing here of the vomit or the blood?

A.    No.

Q.    And again, there was no match to Mr. McKay?

A.    No.

Q.    On either samples?

A.    No.

Based on the fact that there was no DNA evidence or Fingerprints linking the applicant of being inside of the victim's home shows that the evidence was insufficient to support a conviction. The testimony from the victim stating that her assailant did not wear gloves and he also grabbed certain items from her home caused law enforcement to conduct a finger print test on certain items. When these fingerprints were lifted and tested by law enforcement, they did not match the applicant's fingerprints or DNA.

Further, the inconsistence testimony from the victim regarding the alleged time of the incident happening, and the applicant alibi witness statement, clearly supports that the evidence is insufficient to convict the applicant. Courts have held that evidence is not legally sufficient. When viewing the evidence in a light, most favorable to the verdict, a trier of fact could not have found the essential elements of the offense beyond a reasonable doubt.

**ISSUE III**

**THE APPLICANT'S COUNSEL WAS INEFFECTIVE AT THE TRIAL ON THE MERITS.**

The Sixth Amendment right to counsel is the right to the effective assistance of counsel, and the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

The Applicant also contends that his Defense Counsel rendered him ineffective assistance of counsel when he failed to present mitigating evidence or on cross-examination of the Prosecutor's witness during the punishment phase of trial, to lay the proper predicate to show that the victim made inconsistent statements throughout the trial and that he failed to raise the issue to the Appellant's mental competency.

The Applicant contends that the verdict against him should be overturned based on the fact that the State's key witnesses, the victim, made inconsistent statements throughout the trial and his attorney failed to lay the proper predicate to show the inconsistent statements. In Huffman v. State, 479 S.W.2d 62 (Tex.Cr.App.1973), it was held that proper predicate must be laid before prior inconsistent statements may be offered for impeachment purposes, and it must contain some details in regard to the circumstances in which the statement was made; thus it is usually necessary to specify, in the question or questions to the witness, the place, time and person to whom the statement is made.

In Huff v. State, 576 S.W.2d 645, 647 (Tex.Cr.App.1979), this Court wrote:

"The proper predicate for impeachment by prior inconsistent statement requires that the witness first be asked if he made the contradictory statement at a certain place and time, and to a certain person. Ellingsworth v. State, Tex.Cr.App., 487 S.W.2d 108; Huffman v. State, Tex.Cr.App., 479 S.W.2d 62. If the witness denies making the contradictory statement, it can then be proved by the prior inconsistent statement. Ellingsworth v. State, supra; Thrash v. State, Tex.Cr.App., 500 S.W.2d 834. If the witness admits the prior inconsistent statement, however, the prior statement is not admissible. Wood v. State, Tex.Cr.App., 511 S.W.2d 37." See also Moore v. State, 652 S.W.2d 411, 413 (Tex.Cr.App.1983); Haynes v. State, 627 S.W.2d 710, 712–713. In 1 Ray, Texas Law of Evidence, § 692, p. 633 (Tex.Practice, 3d ed. 1980), it is written:

> "... that before a witness could be impeached by prior inconsistent statements a predicate must first be laid. This consists in asking the witness, on his cross-examination, whether he made the alleged contradictory statement. The witness is thus warned that the statement will be used against him. He is given an opportunity to deny it and prepare to disprove it, or if he admits making it, to explain the statement. This rule is recognized in almost all jurisdictions...."

As noted earlier, if the witness unqualifiedly FN3 admits making the prior inconsistent statements, this precludes further proof the statement such as the introduction of the statement into evidence. See Haynes, supra; Huff, supra; Kepley v. State, 320 S.W.2d 143, 145 (Tex.Cr.App.1959); 1 Ray, Texas Law of Evidence, § 695, p. 640 (Tex.Practice, 3d ed. 1980).FN4 The rule is explained in Wood at 43, that "under circumstances the witness has performed the act of impeachment upon himself or herself." Sloan v. State, 129 Tex.Cr.R. 131, 84 S.W.2d 484 (1935); Kepley, supra; Cherb v. State, 472 S.W.2d 273, 278 (Tex.Cr.App.1971), Judge Hurt stated in Walker v. State, 17 Tex.App. 16 (1884):  In particular, the victim initially stated to the police that

responded to the 911 call wherein she stated that she was attacked in her bedroom in her home about 6:45 in the morning. She also testified that she never lost consciousness at any time and that she remembers every detail. Her initial recount of the time and what happened later changed, by the nurse working at the hospital and an investigating officer. They decided that due to the swelling of the victims face and the dried blood that it could not have happened at the time the victim said it did.

In particular, the victim initially stated to the police that responded to the 911 call wherein she stated that she was attacked in her bedroom in her home about 6:45 in the morning. She also testified that she never lost consciousness at any time and that she remembers every detail. Her initial recount of the time and what happened later changed, by the nurse working at the hospital and an investigating officer. They decided that due to the swelling of the victims face and the dried blood that it could not have happened at the time the victim said it did.

Officer Michael Calvin was the first police to respond to the emergency call and began the investigation by speaking with the victim. He testified as followed:

A.    I was assigned to the patrol division.
Q.    Okay. And as a patrol officer were you dispatched to 318 South 2nd Street on that day?
A.    Yes, ma'am, I was.
Q.    Tell the jury what you found when you arrived.
A.    When I arrived at the residence and knocked assaulted.
Q.    All right.
A.    And 1 asked her who was it. And she yelled out, "Trubie, come on out." And Ms. Moore came out of the back of the residence and came and sat down in a recliner that was in the Living room.
Q.    Okay. And could you see from Ms. Trubie's situation that she had, in fact, been hit --
A.    Oh, yes, ma'am.
Q.    -- multiple times?
A.    She had been assaulted.
Q.    Okay. Now, did Ms. Trubie tell you when this happened?

A.     She had -- at the first time I encountered with her she advised that it had happened probably an hour prior to that.

Q.     Okay. Was that consistent with what you observed as far as her -- the blood and the things on her body?

A.     No. The blood was kind of -- some of it was kind of dried up. It had probably happened longer than that.

Cross-examination:

Q.     When was the first time you interviewed Ms. Trubie?

A.     Ms. Trubie?

Q.     Yes.

A.     When I first received the call at -- not -- at -- on South 2nd. Street.

Q.     Would that be around 7:45 a.m.?

A.     Yes.

Q.     That morning?

A.     Yes.

Q.     And that's when you went to this other woman's house?

A.     Right.

Q.     That's where you found her? At that time Ms. Trubie had told you that the incident occurred approximately an hour before?

A.     Yes.

Q.     And that would set it at 6:45; is that correct?

A.     Yes.

The Applicant also contends that it was Officer Calvin that wanted to change the time of the assault to match his theory of the case. The victim said that she was attacked at 6:45 a.m., but Officer Calvin believed it happened earlier in the morning. See the following:

A.     She had -- at the first time I encountered with her she advised that it had happened probably an hour prior to that.

Q.     Okay. Was that consistent with what you observed as far as her -- the blood and the things on her body?

A.     No. The blood was kind of -- some of it was kind of dried up. It had probably happened longer than that.

Q:     Okay, was that consistent with what you observed as far as her- blood and things on her body?

A:     No. The blood was kind of – some was kind of dried up. It had probably happened longer than that.

And it was on Officer Calvin's second interview of the victim at the hospital where it was first learned that the victim was sexually assaulted. This is where the victim

first made an outcry to Ms. Gray. She never told her that she was sexually assaulted at any time. She did not tell Officer Calvin when he first interviewed her at Ms. Gray's home that she was sexually assaulted. There is no testimony from the EMS personnel that indicates that the victim reported that she was sexually assaulted in any manner.

Officer Calvin testified to the following:

> Q. That same day? Okay. When you spoke with Ms. Trubie out at the hospital did she provide you with any additional information regarding this assault?
> A. Yes, she did.
> Q. Okay. And what did he tell you? She stated that during the course of the assault that the actor had stuck his finger up her rectum.

> Officer Walter Stanley testified as followed:

> A. I think she told me it was her purse that was taken. And it had some stuff in it. I don't remember exactly what was in it, but her purse was taken.
> Q. Isn't it correct that that merchandise that she indicated was ultimately discovered still at her house?
> A. I think there was same money or some items recovered at the house. Yes, sir.
> Q. Including money?
> A. Yes, sir.
> Q. Cash?
> A. In an envelope. Yes, sir.
> Q. Is it also correct that subsequent to that initial statement the law enforcement was contacted and was. advised that the incident did not occur at 6:45 or 7:00, but actually they wanted to change the statement to make it to 2:30?
> A. Around 2:00 o'clock in the morning. Yes sir. That's true.
> Q. So that was another change made?
> A. Yes, sir, it was.

The Applicant contends that the victim never told Ms. Natelia Gray that she was attacked in her home. The victim drove to Ms. Gray's home to seek help. The victim told Ms. Gray that she was attacked but never mentioned that she was sexually assaulted. The Applicant argues that the time of the attack of the victim was changed by hospital

personnel. Nurse Susan Barret changed the time that the victim said that she was originally attacked and said that the victim did not remember the actual time because she was knocked unconscious. It was the nurse that said that the victim was attacked after midnight, not the actual victim herself.

On direct-examination, the victim was not asked specifically where was she actually attacked. The Prosecutor asked her what time did she go to bed, not what time was she attacked in her home. On cross-examination, Defense asked her did she tell the first police officer that spoke to her that she was attacked at 6:45 a.m.. She said that she did not tell him that but she does remember changing the time.

The victim testified to the following:

Q. Now, when you woke up, do you recall approximately when that was?

A. No. I don't know exactly when it was. Do you recall telling Officer Calvin that it happened around 6:45?

A. I don't remember telling him that. Do you recall calling the police department later on that day or the next and saying it did not happen --

A. That day.

Q. Oh, that day? And told them it did not happen at 6:45, but you thought it happened at 2:30 in the morning?

A. That's right.

Q. Do you recall that?

A. Yeah.

Q. Did anyone tell you that it had happened around 2:30?

A. No. No.

Q. So it was your decision to tell Mr. Calvin or Officer Calvin 6:45 and then correct it later by saying; no, it was 2:30?

A. No. I don't remember that.

Q. You don't remember correcting yourself? You don't remember calling back and saying it was 2:30?

A. No, I don't.

Q. Okay. Do you recall telling the officers that same property had been taken like your driver's license, some money, credit cards, social security card, that type of thing?

A. Yeah. I remember that.

Q. Okay. Do you recall contacting them later and saying that; no, in fact, they were not taken, that they were still at the house?

A.      I don't remember that.

The Applicant contends that his convictions should be overturned based on the facts that the State's key witness, Ms. Trubie Moore, the victim's testimony is unreliable because of the many inconsistent statements that she gave Officer Calvin, the first officer who interviewed her.  Officer Calvin asked Ms. Moore did her attacker wear a mask of any sort and she told him no, that he did not.   She did not tell him at no time that her attacker tried to hide his identity or had anything on his head.  At trial, Officer Michael Calvin testified to the following as he first interviewed the victim.

On cross-examination, Officer Calvin was asked the following:

Q.      Okay.  I believe you indicated that the - - in your report you indicated that the sound of the door being kicked in and the television being - - falling to the floor actually woke her up; is that correct?

The Applicant also contends another crucial point to the credibility of the victim's testimony concerning being able to correctly identify her attacker.  It is to whether or not her attacker was able to kick down her front door quickly moving down the hallway to assault her while she was still lying in bed or did she get up to meet her attacker at her bedroom door.  Officer Calvin was the first police officer to interview the victim and he wrote down and testified what the victim told him.  The victim initially told him that she was in bed when she heard the door break and her attacker quickly moved down the hallway and attacked her while she was still in bed.

Officer Walter Stanley was the second investigating officer that the victim spoke to and she also told him the same story about how her attacker moved quickly down the hall after breaking down the front door and attacked her while she was in bed.

40

Officer Stanley testified to the following:

A.      No, sir.  She was just -- basically said that she - - the door was kicked down.  The   person came running in there and jumped on top of her on the bed and started beating her.  Where is your purse?  Where is your purse?  But as far as time; no, sir.

Q.      Did she indicate whether or not she tried to defend herself?

A.      She said he was hitting her so hard, that she couldn't do anything is what she said.  Yes, sir.

Q.      When you came to the house were any lights on?

A.      Not that I know of.  No, sir.  I don't  remember one.

Q.      Okay.

A.      I remember having trouble turning that light on.  Because I think maybe the lamp might have been knocked over.  And we had - - and we used flashlights to get in there.  We left the door like it was.

Q.      And you used flashlights, and it was around 10:00 a.m. in the morning?

A.      Yes, sir.

Q.      And was the room dark?

A.      Yes, it was.

At trial, the victim, Ms. Trubie Moore, testified to a different set of facts during her testimony.  She did not testify to what she told both Officer Calvin and Officer Stanley at her initial investigation.  She changed her initial story for the third time.

The Applicant believes that the victim later changed her statement about what time she was attacked based on what the nurse and the officers told her.  The victim first said that she was attacked at 6:45 a.m. then later changed it to 2:30 a.m. or 2:45 a.m. The victim was asked whether or not she ever was knocked unconscious or loss consciousness and she said no.  She testified that she never lost consciousness and she did not remember that she told people that she was attacked at 6:45.

The victim testified as follows:

Q.      Now, when you woke up, do you recall approximately when that was?

A.      No. I don't know exactly when it was. Do you recall telling Officer Calvin that it happened around 6:45?

A.     I don't remember telling him that. Do you recall calling the police department later on that day or the next and saying it did not happen --

A.     That day.

Q.     Oh, that day? And told them it did not happen at 6:45, but you thought it happened at 2:30 in the morning?

A.     That's right.

Q.     Do you recall that?

A.     Yeah.

Q.     Did anyone tell you that it had happened around 2:30?

A.     No. No.

Q.     So it was your decision to tell Mr. Calvin or Officer Calvin 6:45 and then correct it later by saying; no, it was 2:30?

A.     No. I don't remember that.

Q.     You don't remember correcting yourself? You don't remember calling back and saying it was 2:30?

A.     No, I don't.

Q.     Okay. Do you recall telling the officers that some property had been taken like your driver's license, some money, credit cards, social security card, that type of thing?

A.     Yeah. I remember that.

Q.     Okay. Do you recall contacting them later, and saying that; no, in fact, they were not taken,

A.     I don't remember that.

Nurse Susan Barrett testified that based on her experience, the facial swelling, and the dried blood, that the attack happened much earlier than what the victim initially reported.

Q.     Okay. Now, did Ms. Trubie ever tell you when this happened? Did she give you a time line of any sort?

A.     She said -- I believe she said it happened early this morning. I believe I got her in shortly after 8:00 o'clock in the morning. Oh, let me see. can tell you. I got her at 8:20 in the morning. this morning. And 1 assumed from the amount of swelling that she had that it had been probably somewhere, you know, after midnight. It was significant swelling. And it takes awhile for that type of swelling to develop. That's why right after an injury we normally put an ice pack on something to stop the swelling or try to reduce it to stop the blood flow.

A.     But based an my experience far 25 years of nursing, patients will come in what have been in automobiles. And if it -- in wrecks or same kind of trauma. And as the time period progresses from the

time of the actual injury, the swelling will progress. It takes awhile for swelling to become that great unless, of course, the patient is on same type of a blood thinner or like Coumadin or something like that which can make you bleed even more. I have never known her to be on any Coumadin from -- she's diabetic. But that doesn't affect bleeding time. And so based upon the nurses -- when we were in there, we looked at her. And supposedly, you know, she had --it happened early in the morning. We think that she was possibly knocked unconscious because the swelling was so significant and the blood was completely dried an her gown. There was no wet bleeding. And it was very swollen. And so we pretty much surmised that this had occurred earlier in the -- you know, in the wee morning hours instead of closer to the 8:00 o'clock time when she came in.

Q. Are you talking about 1:00, 2:00, or 3:00?

A. It could have been, you know, easily that -- you know, especially if she was knocked out, then

The victim, while at Natalie Gray's home, which is the place that the victim drove to for help, called the police. The victim was adamant that she was attacked at 6:45 a.m. and that she never lost consciousness.

The Applicant contends that the above opinions and conflicting testimony by the victim and key witnesses concerning whether or not the victim lost consciousness is extremely crucial to his cases. If the victim was perfectly sure that she was attacked at 6:45 as she told the police officer and that she never was knocked unconscious, but later changed her story that she was attacked at 2:30 a.m., four hours earlier than what she initially reported, that conflicting testimony, because if she was attacked then the Appellant could not have been convicted of the crime. The victim did not change her story until coming into contact with Nurse Susan Barrett. Nurse Barrett is the person that had and held to the opinion that the victim was attacked at an earlier time and that the reason the victim did not remember was based on the fact that her attacker knocked her unconscious. This timeline was given to the victim based on the nurse's own deduction

43

of her injuries and how long it takes for the face to swell and the amount of time for the victims blood to dry. The victim, during her testimony, did not remember that she initially told everyone that she as attacked at 6:45 a.m. but she does remember that she called Officer Walter Stanley to change the time of the attack to 2:30 a.m. or 2:45 a.m.

## PRAYER

For these reasons, Applicant asks that the Court grant this writ of mandamus.

**STATE OF TEXAS**     §
**HARRIS COUNTY**     §

## UNSWORN DECELRATION

My name is AUGUSTIN T. PINK, my address is 2646 South Loop West #195, Houston, Texas 77054.  My date of birth is March 1, 1964, I am over 18 years of age, of sound mind, and capable of making this affidavit; and I swear under the penalty of perjury that the facts contained in this affidavit are within my personal knowledge and are true and correct.

1.   I am the attorney for relator.  All the documents included with the petition for writ of mandamus are true copies."

_/s/ Augustin T. Pink___
Augustin T. Pink

## CERTIFICATE OF WORD COUNT

This is to certify that this writ of mandamus contains approximately 11,843 words.


/s/ Augustin T. Pink
Augustin T. Pink


## CERTIFICATE OF SERVICE

I certify that I served by Certified US Mail Return Receipt Requested on January 27,

2015, a copy of this Writ of Mandamus on the following parties:

    a.    The attorney for State of Texas, District Attorney Donna Gordon Kasper, 401 East Houston Avenue, Crockett, Texas via email only to: lgoolsby@co.houston.tx.us.

    d.    The respondent, the Honorable Pam Fletcher, judge of the 349th Judicial District Court of Houston County, Texas, via email only to: ewmccoy@co.houston.tx.us.


/s/ Augustin T. Pink
Augustin T. Pink